### BLOUNT v. GRAND TRUNK RY. CO.

(Circuit Court of Appeals, Sixth Circuit. April 3, 1894.)

#### No. 121.

CONTRIBUTORY NEGLIGENCE—GATES UP AT CROSSING—QUESTION FOR COURT.

The question whether a pedestrian was guilty of contributory negligence in not looking and listening at a railroad crossing for an approaching train, where the gates had not been lowered, is not a question for the jury, where the evidence leaves no doubt that, if such pedestrian had made any use of his senses, he could have both seen and heard, in due season, an approaching train, and thereby have avoided the accident which resulted in his death.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Edwin C. Bolton (Moore & Moore, of counsel), for plaintiff in error.

L. C. Stanley and E. W. Meddaugh, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

TAFT, Circuit Judge. This is a writ of error to reverse a judgment of the circuit court of United States for the eastern district of Michigan. The action below was by Bessie Blount, as the administratrix of her husband, George W. Blount, against the Grand Trunk Railway Company, to recover damages for his death. He was killed by a train of the railway company on the night of August 10, 1891. After all the evidence on both sides had been submitted, the trial judge directed the jury to return a verdict for the defendant on the ground that the plaintiff's intestate was conclusively shown to have been guilty of contributory negligence. The sole question for our consideration is whether, on the evidence in the case, this was a proper instruction.

The accident occurred at Second avenue, in the city of Detroit. Second avenue runs north and south, and was crossed at right angles by the tracks of three different railways at the same place. The north track was that of the Grand Trunk Railway, the middle track that of the Lake Shore Railway, and the southern track that of the Michigan Central Railway. These three companies, as required by the law of Michigan, jointly maintained at the crossing gates on the north and south side of the tracks, and employed a man to raise and lower them as the passing of trains might require. The deceased was a watchman in a factory situate within a few hundred feet of the crossing, and was well acquainted with it. About 9 o'clock in the evening on the date before mentioned, he left his factory to visit one Hoy, who lived on the north side of the railway crossing, and on the west side of Second avenue, in a house distant about 60 feet from the north gate. He found Hoy sitting on the south porch of his house, and, after a talk of some 10 or 15 minutes' duration, Blount started back to his factory to resume his duties. He walked from Hoy's gate to the middle of the Grand Trunk track without stopping. He was there struck by a regular transfer and suburban passenger train of the Grand Trunk Company, drawn by an engine running with its tender in front. He was instantly killed. There was evidence to show that the bell of the engine did not ring and that there was no headlight upon the engine, and that the train was running at a speed of 15 or 20 miles an hour,—very much faster than was permitted by the ordinances of the city of Detroit. The night was a starlit, clear night. From Hoy's porch and front gate, and from every point between the gate and the crossing, the track of the Grand Trunk Railway was visible for upwards of 2 blocks, or 800 feet. There were no obstructions of any kind. On the south side of the railway crossing, and to the east of it, stood a large ice house, which, by reason of an electric-light tower some 2 blocks away, cast a shadow over the crossing, and for perhaps 75 or 100 feet to the east of the crossing. Blount's sight and hearing were neither of them defective. The only person who saw Blount at the time of the accident was a witness named Snelling, introduced by the plaintiff. He was walking on the same

side of the street as Blount, and in the same direction, but about 75 feet behind him. Snelling testified on cross-examination as follows:

"Q. This man [i. e. Blount] walked straight from the gate to the railroad tracks? A. Yes, sir. Q. And the train hit him right there in the middle of the track? A. Yes, sir. Q. Was he looking down the sidewalk most of the time? A. He was looking ahead of him, I expect. Q. He didn't look up to see either way if the train was coming? A. It was rather dark, and I could not say whether he turned his head or not. I didn't watch him close enough. * * * Q. This man didn't see the train until it actually struck him; is that the way it was? A. Yes, sir. Q. You saw him make no move to get out of the way? A. He didn't have time. Q. Did you think he was in danger before he was struck? A. I didn't think he was; no. Q. Did you think he was going to get over ahead of the train? A. I expected he would. I thought probably he noticed the train himself. Q. What made you think he noticed the train? A. Because I noticed it. It wasn't off very far, and I thought he noticed it too. Q. You thought he ought to have noticed it? A. I should think he ought to. Q. You didn't see him stop anywhere? A. No, sir. Q. Until he was struck? A. No, sir. Q. And you didn't see him look in either direction? A. He was going ahead. Q. Did he seem to be in a hurry? Was he running? A. No, he was not running. Q. What did you see of the train. How did you come to see it? A. I was coming along, it was right close by, and I looked that way, and I seen it. Q. You saw the lights? A. I saw them on the train. Q. Didn't you see the other lights? A. I saw the lights in the coach. Q. The coach was lighted? A. Yes, sir; it had a light. Q. Did you hear the train coming? A. I didn't hear it until it was right near there. Q. You could have seen it way beyond there, if you happened to look? A. Not a great ways. Q. There is nothing to prevent that view, however? A. Not in the daytime. In the dark you could not see. Q. You could see those coach lights up to Cass Ave.? [a block away from Second Ave.] A. Oh, yes; might there. Q. From where you were? A. Yes, sir."

Direct Examination: "Q. When did you first see the train that struck him? A. It was just across the road."

The witness testified that the gate was not lowered at the time the train passed, and that the red lantern which was suspended on the gate was up, and not down, when Blount stepped upon the track. The witness was contradicted as to the position of the gates by five other witnesses, who had much better opportunities for knowing, and two of them were wholly disinterested. For the purpose of this discussion, however, Snelling's statement that the gates were up must be accepted as true.

On these facts, can reasonable men differ as to the negligence of Blount? We think not. If we may assume that Blount was walking at the rate of 3 miles an hour, and the train was running at the rate of 15 miles an hour,—an assumption decidedly in favor of the plaintiff,—the train was moving at a rate of speed five times that of Blount. Therefore, when Blount was at Hoy's gate, 60 feet away from the track, the train was 300 feet away from him; when he was 30 feet from the track the train was 150 feet away from him, and when he was 15 feet away from the track the train was but 75 feet away from him, and all the time in full view.

Snelling saw and heard the train when he was 75 feet from the track, and the train was on the other side of Second avenue. Assuming Second avenue to be 75 feet wide, the train was visible to him (Snelling) at a distance of over 100 feet, and he admits that, if he had looked, he could have seen the train at Cass avenue, 400

feet away. The night was a clear, starlit night, and, while there may have been some shadow cast by the ice house from the electric light just at the crossing, it did not interfere with Snelling's seeing the train more than 100 feet away while the train was in this shadow. The train was visible from Hoy's gate, however, before it entered the shadow, and Hoy, another witness for the plaintiff, said that he could hear the rattle of the train as it came down from Cass avenue. We think the evidence leaves no doubt that, if Blount had used his senses in any way from the time he came out of Hoy's gate until he reached the track, he would have seen the train, and but for the fact that he was absorbed, and failed to give heed to the warnings which his senses, if on the alert, would have conveyed to him, the accident would not have occurred. If there had been no gate at the crossing, there could be no doubt that this conclusion must be reached. Railroad Co. v. Houston, 95 U. S. 697; Schofield v. Railroad Co., 114 U. S. 615, 5 Sup. Ct. 1125; Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85. But it is pressed upon us that the case at bar differs from the cases cited, in that here were gates established by law for the purpose of warning and keeping travelers off the crossing. Therefore, it is said the fact that the gates were up when Blount reached them was an invitation to him to cross, upon which he had a right to rely. It is undoubtedly true that the failure to lower the gates modifies the otherwise imperative duty of travelers, when they reach a railway crossing, to look and listen, and the presence of such a fact in the case generally makes the question of contributory negligence one for the jury, when otherwise the court would be required to give a peremptory instruction for the defendant. Burns v. Rolling-Mill Co., 65 Wis. 312, 315, 27 N. W. 43; Stapley v. Railway Co., L. R. 1 Exch. 21; Glushing v. Sharp, 96 N. Y. 676; Railway Co. v. Schneider, 45 Ohio St. 678, 17 N. E. 321. The fact is much more important where the traveler is driving a horse and vehicle than where he is walking, because in the former case his attention is necessarily divided between the control of the horse and observation of the track, and his reliance upon the gates and the flagman must, in the nature of things, be greater than in the case of a pedestrian. There is no reason why the latter should not look and listen as he approaches the railway crossing, before he reaches the gates, and before it may be time to lower them. The right to rely on the action of the railway company's employe in lowering the gate is not absolute. State v. Boston & M. R. Co., 80 Me. 430–444, 15 Atl. 36. If it were, then a man would be justified in walking up to and over a railway crossing with closed eyes and stopped ears whenever the gate is not down to obstruct his passage. The weight to be given to such an implied invitation depends on circumstances. In this case, Blount had stood at Hoy's porch, where he could see the track for 800 feet. From Hoy's gate for 60 feet he walked towards the track, while the train was in full view, but 300 feet away, and was getting nearer and nearer each second. As the train passed the ice house at a speed of 15 miles an hour, its roar must have been heard by any one giving the slightest attention, who was not 100 feet away. When he was 6 feet from the track,

the train was only 30 feet from him, and in full sight, and yet he did not halt or hesitate, but rashly stepped in front of it. It was a quiet night. There was no confusion at the crossing. There were no other trains in sight. There was nothing to distract Blount's attention from the oncoming train except a self-absorption which in approaching a railway crossing is gross negligence. On these facts can reasonable men fairly reach any other conclusion than that Blount was wanting in due care in not observing his danger?

We have no wish, in expressing this conclusion, to weaken at all the obligation upon the railway company to lower its gates when trains pass, and we freely concede that such a failure is to be regarded as an invitation to the traveler to cross the track in safety. Railway Co. v. Wanless, L. R. 7 H. L. 12–15. The extent to which the traveler may rely on such an invitation, and omit the ordinary precautions of looking and listening, is usually a question for the jury. This case, however, we think to be exceptional in its facts, which permit only one inference.

As the evidence of the plaintiff's contributory negligence was of such a conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it, it was the duty of the court to direct a verdict for the defendant. Railway Co. v. McDonald (decided by the supreme court of the United States, March 5, 1894) 14 Sup. Ct. 619; Railroad Co. v. Converse, 139 U. S. 469, 472, 11 Sup. Ct. 569, and cases there cited; Elliott v. Railway Co., 150 U. S. 246, 14 Sup. Ct. 85.

The judgment of the circuit court is therefore affirmed.