## DETROIT SOUTHERN R. CO. v. LAMBERT.

(Circuit Court of Appeals, Sixth Circuit. February 18, 1907.)

### No. 1,554.

**1. TRIAL—DIRECTION OF VERDICT—EFFECT OF MOTION.**

On a motion for direction of a verdict, the court must take that view of the evidence most favorable to the party against whom the instruction is asked.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 402.]

**2. SAME—QUESTIONS FOR JURY—CONFLICT OF EVIDENCE.**

Where there was positive testimony that signals were given by a railroad train at a crossing, and also testimony by other witnesses who were where they should have heard such signals if given, that they did not hear them, the question was one for the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 342, 343.]

**3. EVIDENCE—OPINION OF WITNESS—MATTERS DIRECTLY IN ISSUE.**

On the trial of an action to recover damages for the death of a man who was struck and killed by a switching train while driving over a railroad crossing with which he was familiar, and which he crossed often in his daily work as a teamster, it was error to allow another teamster as a witness to state his opinion that there would have been no "unusual danger" in driving upon the track as the deceased did if the train had been going at the usual rate of speed, such statement being in effect an opinion as to the negligence of the deceased, which was an issue before the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 2189, 2248, 2250.]

Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Henry T. Hunt, for plaintiff in error.

Wm. D. James, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. The deceased, Frank Waller, was struck by a Detroit Southern switch train, consisting of an engine

pushing two empty cars, a box and a gondola, while he was in the act of driving a team of horses attached to an empty wagon, across what is termed the "main siding" or track of that company at the Big Etna crossing in Ironton, Ohio. The Big Etna furnace is on the Ohio river in the upper end of Ironton. The river here runs in a northwesterly direction. The tracks of the Norfolk & Western and the Detroit Southern railways parallel the river. Between them and the river lies the furnace. A wagon road leads from the furnace to Third street, crossing four tracks, two of the Detroit Southern and two of the Norfolk & Western. The first track is the long siding of the Detroit Southern; the next the main siding or track of the same road, the third the main track of the Norfolk & Western, and the last a siding of that road. These tracks are 13 feet apart from center to center, the distance between the rails being 8 feet. Southwest of the long siding of the Detroit Southern is a short siding or stub switch, which ends near the laboratory building of the furnace, about 60 feet west or northwest of the crossing. On the wagon road, 25 feet from the long siding, on its river side, stood the furnace scales. The accident occurred about 5:30 p. m., on April 5, 1904, about the time the teamsters and men on the day turn were quitting work at the furnace, where some 200 were employed. At this time both the short and the long sidings of the Detroit Southern were full of cars. At the crossing a gap variously estimated from 10 to 40 feet in width was left between the side-tracked cars for the passage of teams. Next the crossing on the northwest, the direction from which the Detroit Southern train came, there were first two gondola cars, each 9 feet high, and then a cattle car with solid ends and lattice sides, 12 feet high. Other cars followed, mostly gondolas. The wagon Waller used was 45 inches high from the ground to the top of the bed. He was a man 5 feet and 6 inches in height and was in the habit of sitting on a board laid across the top of the bed. Necessarily, his view of the track was much obstructed; precisely to what extent was a disputed question. Waller was thoroughly familiar with the dangers of the crossing, having been employed there as a teamster for more than two years. Just prior to the accident, he had emptied his wagon at the furnace and started to drive home. When he reached the crossing, a heavy Norfolk & Western freight train carrying some 40 loaded cars, was proceeding northwest on the third track from the furnace. Waller stopped near the furnace scales, the front feet of his horses being between the rails of the long siding or first track. As soon as the Norfolk & Western freight passed, Waller started across and his team was struck, about the shoulder of the near horse, by the front car of the Detroit Southern switch train. Both the horses were killed, the wagon demolished, and Waller received injuries from which he died within a few hours. The plaintiff below claimed the railway company was guilty of negligence in running its train at an unusual and dangerous rate of speed without giving notice of its approach by blowing the whistle and ringing the bell. In defense, the railway company contended it was not running the train at an unusual and dangerous speed, that it did blow the whistle and ring the bell as it approached

the crossing, and, however this might be, no recovery could be had, because Waller himself was guilty of negligence in not looking and listening before he attempted to cross the track. Otherwise, he would have observed the approach of the train and could have avoided the collision. The railway company asked for peremptory instructions on both points, which were refused, and a verdict and judgment rendered for the plaintiff. These two rulings and a refusal to exclude certain testimony offered by the defendant are the errors we are asked to correct. The rule is well settled that where a motion is made for a peremptory instruction, the court must take that view of the evidence most favorable to the party against whom the instruction is requested (Schofield v. Chicago & St. Paul Ry. Co., 114 U. S. 615, 619, 5 Sup. Ct. 1125, 29 L. Ed. 224; R. R. Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463; Riley v. L. & N. R. R., 66 C. C. A. 598, 133 Fed. 904; Williams v. Choctaw, etc., R. R. [C. C.] 149 Fed. 104); so that, in this case, the plaintiff below was entitled to receive the benefit of all fair and reasonable inferences from the testimony.

Upon the question of speed, three or four witnesses for the plaintiff testified that the train was running faster, some said much faster, than usual, and there was testimony tending to show that after the brakes were applied, the train ran in the neighborhood of 150 feet before it could be stopped, one car, the gondola, being thrown from the track by the impact. The testimony of the trainmen tended to show the train was not running more than five or six miles an hour. The resulting conflict in the testimony was, of course, for the jury to determine. As to the question of signals, six witnesses testified for the defendant below that signals were given, while four witnesses for the plaintiff below testified they did not hear any whistle blown or bell rung. If we had the right to pass upon it, we should say the weight of the testimony on this point undoubtedly was in favor of the contention of the railway company, but since some of the plaintiff's witnesses were where they ought to have heard the whistle, if it was blown, it seems to us, taking the rule laid down in N. P. R. R. v. Freeman, 174 U. S. 379, 381, 19 Sup. Ct. 763, 43 L. Ed. 1014, that there was a conflict of testimony, which was properly left to the jury. This brings us to the alleged negligence of the plaintiff's intestate in failing to look and listen. In considering this, it is necessary to examine the testimony reflecting upon this point with some care.

Martin, one of the witnesses for the plaintiff below, employed at Big Etna, passed over the crossing just behind the Norfolk & Western freight train. He waited between the scales and the main line of the Norfolk & Western, about the edge of the Detroit Southern track, for the Norfolk & Western train to pass. He says he saw Waller with his team near the scales. The engine of the Norfolk & Western train was passing as he reached the crossing. He did not see or hear any Detroit Southern train. When the Norfolk & Western train had passed, he started across and was about 8 or 10 feet beyond the Norfolk & Western main track, when a man halloed. At that he turned and saw that the Detroit Southern train had struck the team. Ball, another witness for the plaintiff, was sawing cross-ties near the track of the Detroit

Southern, about 100 yards northwest from where the accident occurred. When the train was about 50 feet from the crossing, he saw the team, that is, the horses, coming on to the crossing ahead of the train. Henthorn, the engineer of the Detroit Southern train, and Bruce, the brakeman in charge, who was on the front end of the gondola, on the left hand side, both testified that they observed Waller. Henthorn said that he was about three cars and a half below the crossing when he first observed him. Waller was then looking straight over the crossing. His horses were standing between the long siding and the short switch which runs up to the scale house. When the witness was about half a car length from the crossing, Waller started over, and then the witness applied the brakes and reversed. Bruce testified that it was about three cars' length when he saw Waller sitting in the wagon. When they got about a car length from the crossing, Waller made a move as if he were going to start, and the witness halloed to him just as loud as he could; but instead of stopping, he started to rush on. When the witness first saw Waller, he was sitting in the wagon, looking ahead. He was between the long siding and the short track back of him. His horses' heads were near the rail of the long siding next the furnace. At that time the Norfolk & Western train was passing. The witness supposed Waller was looking at that train. Charles Layne, employed by the company operating the Big Etna furnace, was near the upper end of the long siding about 75 steps from where the accident occurred, walking towards the crossing. He saw the Norfolk & Western freight coming northwest and saw the Detroit Southern yard engine coming southeast. As the Norfolk & Western train got over the crossing, the Detroit Southern yard engine was coming "awful close" to the crossing, and just then Waller drove on to the crossing and the Detroit Southern hit him. This witness heard the Detroit Southern engine whistle and heard the brakeman halloo. He was walking between the Norfolk & Western main line and the Detroit Southern main line. The witness did not see Waller until he reached the Detroit Southern track. He had raised up and he jerked his lines, "jerked back his horses." The train was about a car length from him then.

It will be observed that none of these witnesses, and they are the only ones who saw Waller immediately before the accident, testified that he either looked or listened before driving upon the track. There is an interval between the time when Martin left him near the scales and when the engineer and brakeman saw him sitting in his wagon, not covered by the testimony. Under the circumstances the court below left it to the jury to determine whether he did look and listen; the presumption being, in the absence of evidence, that he did. We have carefully considered this testimony, and doubt whether the court was justified in leaving the determination of this question to the jury. It is a matter for very careful consideration whether a fair and reasonable reading of the testimony leaves any opportunity for the conclusion that Waller either looked or listened before driving upon the track. North. Pac. R. R. v. Freeman, 174 U. S. 379, 382, 19 Sup. Ct. 763, 43 L. Ed. 1014; Blount v. Grand Trunk Ry., 9 C. C. A. 526,

61 Fed. 375; C. N. O. & T. P. Ry. v. Farra, 13 C. C. A. 602, 66 Fed. 496; Gilbert v. Erie Ry., 38 C. C. A. 408, 97 Fed. 747. Martin left him just where the engineer and brakeman saw him later, near the scales. He stopped here to allow the Norfolk & Western train to pass. Martin did the same thing, but before stopping, he moved forward until he was on or near the Detroit Southern track. As soon as the Norfolk & Western train cleared the crossing, Martin moved on. He had only got 10 or 12 feet beyond the last track when his attention was called to the accident. Henthorn and Bruce saw Waller when they were three car lengths or more from the crossing. He was then sitting in the wagon with his eyes fixed straight ahead, where the Norfolk & Western train was passing. He certainly had not gone forward and looked and listened or, instead of sitting still, he would and should have been hurrying across. To look and listen and then sit still is not to look and listen, for one must cross directly after looking and listening. In other words, if you sit still after looking and listening, you must look and listen again. Moreover, he did not look and listen with the attention due under the circumstances, or he would have known that the train was coming. He would not have attempted to cross when it was only a car length away. Again, sitting in his wagon, he could have seen the train for three car lengths or more; for those on the train saw him. It is a fair contention, therefor, that the only reasonable inference to be drawn from this testimony is that Waller's mind was fixed on the Norfolk & Western train, that he looked only at it and heard no noise but what it made, that he was on his way home, was stopped by the Norfolk & Western train, waited until it passed, and without ever thinking of a possible Detroit Southern switch engine, drove on to his death.

We do not, however, prefer to put the reversal upon this ground, for the reason that, on another trial, testimony may be adduced which may change the situation, and relieve the court from the necessity of directing a verdict upon the ground indicated, namely, that Waller was negligent. As the case stands now, we prefer to dispose of it upon the following question and answer admitted over objection in the testimony of John Morris, a teamster employed along with Waller, and assigned as error:

"Q. If they had been going their usual rate of speed at which you and Frank Waller and other teamsters there knew them to go, would there be any unusual danger for Frank Waller to start across the track as he did? A. I don't hardly think there would."

This question was objected to, on the ground that it assumed a state of facts which there was no evidence to show existed at the time. The court overruled the objection. In this we think the court erred. While the testimony probably did show that the usual rate of speed in railroad yards of switch engines was from four to six miles an hour, yet the other conditions, bearing upon the question whether it was dangerous or not to attempt to pass under the circumstances, were not established by the testimony or stated in the question. In propounding the question, there was an attempt to substitute the witness for the jury and have him state whether, under all the circumstances,

Waller would have been guilty of negligence in starting across the track if the train had been running at its usual rate of speed. Obviously this could not be done.

The judgment is reversed, and the case remanded, with directions to grant a new trial.