GARLAND *v.* MICHIGAN CENTRAL RAILROAD CO.

NEGLIGENCE—RAILROAD CROSSINGS—AUTOMOBILES.
> In an action by an automobile owner to recover for personal injuries received in a collision with defendant's train at a crossing, judgment affirmed by a divided court.

Error to Bay; Collins, J. Submitted January 18, 1917. (Docket No. 32.) Decided June 1, 1917. Rehearing denied September 28, 1917.

Case by Emma Garland against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed by a divided court.

*George M. Humphrey* and *Cooley & Hewitt* (*Humphrey, Grant & Humphrey,* of counsel), for appellant.

*De Foe, Hall & Converse,* for appellee.

KUHN, C. J. This is an action brought by the plaintiff for injuries sustained by her on the evening of the 29th of June, 1912, while driving her automobile on Salzburg avenue, in West Bay City, over the crossing of the defendant railroad company; her automobile colliding with the Detroit-Bay City passenger train, it being claimed, as a result of the negligence of the defendant in its operation. The plaintiff at the time of the accident was a woman nearly 52 years of age who had lived in Bay City all her life. On the day in question she had driven her car, in which were four other ladies, to Saginaw to shop. In the evening, after having had their dinner in Saginaw, the party returned to Bay City. At about 9:15 they arrived at Salzburg avenue, the main business street of one of the outlying districts of Bay City, and approached the scene of the accident. Salzburg avenue runs approximately east

and west and is crossed by four sets of tracks, running approximately north and south, at an angle of about 66 degrees 30 minutes. The two tracks at the west belong to the defendant company, and the two tracks to the east to the Grand Trunk Railway Company, and it was upon the most westerly track of all, the first track in the direction from which the plaintiff was approaching, that the train in question was running. West of the intersection of the track and the avenue, on the south side of the avenue, there is a one-story brick structure about 20 feet high known as Youngs planing mill, extending for about 250 feet west along the avenue. To the west of that and extending for something over 100 feet is a two-story building known as the sawmill, west of which is a yard used for the piling of lumber and containing a few small buildings. Coming up to the edge of the avenue, but not crossing it, and running parallel with and right along the easterly side of the planing mill, is a sidetrack, the center of which is 8 feet east of the building and 25 feet west of the center of the main track, or 20 feet 4 inches between the nearest rails. Upon this side track within a few feet of the avenue stood a flat car loaded with lumber. The actual width of this car is not shown, but the average width of similar cars is about 8½ feet. Just to the north of the crossing of this track with the avenue South Chilsen street, which runs north and south, intersects Salzburg avenue. On the north side of Salzburg avenue to the west of its intersection with the track there are simply dwelling houses, and just west of the crossing on the north side stands the gatehouse from which gates to protect the crossing are operated.

It is the plaintiff's claim that as she reached the sawmill she was driving the car slowly, and she testified as to what occurred as follows:

"*A.* All the way coming the women were singing,

having a good time, and I was running my car very slowly and enjoying the singing, and when we struck the pavement I said, 'Now, girls, no more noise, because I see the mill is making a noise running nights, and here is this railroad track; I must be guarded for a train; I must look out for the train.' I had been over that crossing before a great many times, and when I said that to the people in the car there was no more talking or singing or noise in the car after that whatever. As I came up to the crossing and before I had seen any trains I did not hear any sound of any train. I had heard no whistle or bell.

"Q. As you approached this crossing from the west is there any place after you reach Salzburg avenue that you can look toward the south and see an approaching train?

"A. No, sir.

"Q. How far away from that crossing or how far away from Salzburg avenue would you say you had to be in order to see a train to the south?

"A. Well, I never took any particular notice coming up there; I always came up there on my guard, and I never noticed. I have never noticed as to whether you can, when you get anywhere near Salzburg avenue.

"Q. In driving along on Salzburg avenue beside the mill can you look south and see a train when beside the mill?

"A. Not very far, I know that. As I came up to the crossing that night I did look at the safety gates. They were up, and the safety gates did not lower at any time that night before the train came.

"Q. Now as you drove up to this crossing state what you did with reference to listening for a train.

"A. Why, I threw—put my car under perfect control with both feet and hands, and was listening very intently for the noise of the train. The mill made a great deal of noise, and I would look out to view the track and look to see if the gates were coming down, and I remember distinctly to see if there was a train, and then I turned my head to look at the gates, and the gate did not come, and I looked again and I saw the train. At the time I saw the train the gates had not lowered then.

"*Q.* Where were you with reference to the corner of the mill, if you know, or as you looked up toward the train what was there between you and the train, if anything?

"*A.* Why the mill was between me and the—the corner of the mill and the car that was up there. There was a car loaded, a loaded car there.

"*Q.* How long had you been familiar with that crossing; for some time?

"*A.* Near since the road was laid, I think. I have lived in Bay City all my life. I have gone over that crossing in the nighttime a great many times, and in the daytime, and have seen other trains pass over the crossing.

"*Q.* You may tell the jury whether or not in all the years that you have been familiar with that crossing you have ever seen a train approach it or pass over it at the rate of speed at which this train was approaching this night?

"*A.* I never saw a train never that came that was coming at the rate of speed that was coming that I spied that moment. I had been up at that crossing in the nighttime before when this passenger train came in with Mr. Garland a great many times, both with a horse and automobile, and up to the time of this accident I had never been at that crossing either in the daytime or nighttime when a train came through when the safety gates were not lowered. I know of no rule or regulation of any kind with reference to what hours the gates were operated. I always supposed when the gates were put there there was a man to take care of those gates night and day, as long as a train went over a track. As I approached the crossing on this night I did not know the gateman had gone away.

"*Q.* Did you hear any sound of the approaching train before it came in sight?

"*A.* No, sir.

"*Q.* What was the first knowledge you had the train was coming?

"*A.* When I turned my head from looking at the gates I saw the train coming with such terrific force; that is the first I heard that the train was coming.

"*Q.* Just tell the jury as best you can what you did or just what happened so far as you ca remember when you looked up and saw that train.

"*A.* When I looked up and saw that train the first thing that came to me was the folks that were behind me, I was to save them, and I instinctively turned to get away from the train that was coming on to me, knowing that I didn't have time to cross it. I turned to the north. After I had done that and started to make the turn I remember nothing more.

"*Q.* When you first saw the train and attempted to turn, state whether or not you turned your car as quickly or as far as you could.

"*A.* I must have, because I did not have time to think of anything only simply the thought that came at the moment, to save what I had."

It appeared that the automobile proceeded down the track ahead of the train until it passed over the pavement and was about on the north sidewalk back of the gatehouse, when it was overtaken by the train, hit and whirled end for end off from the track to the west against a telegraph pole north of the north sidewalk on Salzburg avenue. The plaintiff sustained severe and permanent injuries, the extent of which is not questioned upon this record.

The plaintiff on the trial relied upon but two acts of negligence on the part of the defendant as grounds of liability, failure to ring the bell as required by statute, and running the train at an excessive rate of speed. At the close of the plaintiff's proofs, and again at the close of the case, a motion for a directed verdict was made by defendant's counsel because of the alleged contributory negligence on the part of the plaintiff, which were denied. The jury brought in a verdict for the plaintiff in the sum of $8,000. There are 57 assignments of error which relate to the admission of evidence, to the action of the court in overruling the motions for a directed verdict, and alleged error in the charge and refusal to give certain of the defendant's requests to charge.

The first real contention of counsel for the defendant seems to be that the great weight of the evidence

supports the defendant's claim that the bell was rung and that no jury question upon that subject is presented. It is claimed that, as both the engineer and fireman testified that the bell was ringing, this cannot be disputed by the negative testimony of plaintiff's witnesses. It appears that in all 14 witnesses were called who were present and heard or saw the accident. Two men who were at the crossing and witnessed the accident testified that they did not hear the bell ring. Six witnesses who were present at the place of the accident and were in a position to have heard it if it had rung testified that they did not hear it. The question of negative and affirmative testimony has recently had the attention of this court in *Cinadar* v. *Railway Co.*, 193 Mich. 38 (159 N. W. 312), where Justice STONE in writing the opinion reviews the cases upon the subject. We think that here, as in that case, the question of whether the signal was given was a question for the jury, who, in determining it, are to take all the facts and circumstances into consideration.

· It is the further claim of the defendant that, as a matter of law, there is absolutely no evidence worthy of credence that the speed of the train over this crossing was so excessive as to justify an inference of negligence; that the great weight of the evidence conclusively demonstrates that the speed over this crossing was entirely reasonable and proper, and that there is no evidence upon which negligence can be predicated. An ordinance of the city of Bay City, offered in evidence, limited the rate of speed of trains in the business section of the city to 8 miles per hour and 15 miles per hour in all other sections of the city. The plaintiff contended that the accident occurred in the business section of the city, and the court submitted that question to the jury under a charge to which no exception was taken. Five disinterested witnesses testified for the plaintiff as to the speed of the train, and

the lowest estimate given by any is 25 miles per hour. Opposed to this was the testimony of three of the train crew who estimated the speed of the train as from 6 to 10 miles per hour, and one passenger who was riding in the smoking car estimated the speed as 15 miles per hour. We do not think it profitable to review the testimony of these witnesses, but we are of the opinion that there was sufficient evidence of the speed of the train to warrant the submission of the question to the jury. In fact, if the jury found that the accident happened within the business section of the city, they would have been justified in finding defendant guilty of negligence under the testimony of its own witnesses.

The next question, and the one upon which counsel for appellant seem to place the greatest reliance and which is argued at great length in the briefs, is the question of the alleged contributory negligence of the plaintiff. It is urged that we should determine that under the facts the plaintiff is guilty of contributory negligence as matter of law, and the case of *Sanford* v. *Railway Co.,* 190 Mich. 390 (157 N. W. 38), is strongly relied upon. Counsel for the plaintiff contend that this situation is governed by the ruling of this court in *Rouse* v. *Blair,* 185 Mich. 632 (152 N. W. 204), where it was said:

"This court has recognized various exceptions to this general rule of requiring the traveler to stop before making the crossing, when the view is obstructed."

Should we, as a matter of law, determine that under the circumstances of this case the plaintiff is guilty of contributory negligence? We have repeatedly stated that before such a conclusion can be arrived at all reasonable minds should reach the same conclusion, that under all the circumstances the plaintiff's contributory negligence should bar recovery. See *Beach*

v. *City of St. Joseph*, 192 Mich. 296 (158 N. W. 1045), and cases therein cited. The plaintiff approached this crossing in the nighttime, when distances are of necessity deceiving and objects indistinct. The gates which she assumed were for her protection were up, but she nevertheless looked and listened and prepared to stop her car if necessity required. As she approached the track, just how near she could not tell, this train suddenly appeared out of the darkness. Whether she then acted as a reasonably prudent person would have under the circumstances, it seems to us, is a question which it is only proper for a jury to determine. She says she thought instinctively only of the safety of those in the car, saying:

"I did not have time to think of anything only simply the thought that came at the moment, to save what I had."

She had a right to expect of the defendant's train that it would be operated in a lawful manner, and while she had no right to rely wholly on the performance by the defendant of its legal duty, and therefore avoid all caution for her own safety, she did have a right to assume that such duty would be performed. She stated that she had often crossed the crossing at this time of night, and that the gates had always been operated until after this train had passed. Mr. Heath, who had always lived in the vicinity, and who had been familiar with this crossing, stated that it was the practice of the watchman to wait for that train to go through before leaving the gates, and he said:

"As near as I can remember I never seen the train going through without the watchman lowering the gates."

The engineer of the train stated that, according to his experience, the gates were usually down, and supposed that they were down on that night. The gate-

man disputed this testimony, but on cross-examination he testified:

"*Q*. Now, it is a fact, is it, when that passenger train was late and it came 9 o'clock, you did not always leave on the minute?

"*A*. Oh, one or two minutes, or sometimes three. I did not confine it to two or three minutes after 9 o'clock. Sometimes I stayed longer than that to take care of the crossing, but not very often. But I have done it. I did that off and on at times during all of the years I worked there. People that went by there at different times might come up a little after 9 o'clock and still find me at the gates, and that is the way I had been doing my work all the time that I had been there. That night I had gone away before the train came in."

The failure to lower the gates was not relied upon by the plaintiff as negligence on the part of the defendant, but we are of the opinion that it may very properly be considered as affecting the plaintiff's contributory negligence. In *Beagle* v. *Railroad Co.*, 184 Mich. 17, at page 24 (150 N. W. 345, 347), Chief Justice BROOKE, in writing the majority opinion, quoted from the case of *Ellis* v. *Railroad*, 169 Mass. 600 (48 N. E. 839), where the rule is thus stated:

"While the raising of the gates justified the plaintiff in attempting to cross when he did, and while that fact, and the facts that no whistle was sounded and no bell was rung, are to be taken into consideration on the question of how much he must himself look and observe as he makes his way across, these circumstances do not excuse him from looking and listening, and taking thought for his own safety. He cannot rely wholly upon them, and cannot recover without showing more as to his own conduct than that he so relied. * * * We are of opinion that, as matter of law, there was no evidence from which it could be found that the plaintiff himself exercised due care, and the verdict for the defendant was rightly ordered."

Judge Taft, in a case which arose in this State,

*Blount* v. *Railway Co.*, 61 Fed. 375 (9 C. C. A. 526), stated the rule as follows:

"It is undoubtedly true that the failure to lower the gates modifies the otherwise imperative duty of travelers, when they reach a railway crossing, to look and listen, and the presence of such a fact in the case generally makes the question of contributory negligence one for the jury, when otherwise the court would be required to give a peremptory instruction for the defendant."

Judge Denison in the case of *Erie R. Co.* v. *Schultz*, 183 Fed. 673 (106 C. C. A. 23), said:

"In this court it has been distinctly recognized that the open gate is in the nature of an invitation to cross, and that the presence of such a fact in the case generally makes the question of contributory negligence one for the jury. * * * In spite of the fact that, as we think, the traveler, crossing under circumstances like those shown by this record, is not bound absolutely and at all events to look both ways on the very instant when he comes clear of the obstructions, still his failure to use his eyes and ears might, under some circumstances, be so clearly not the conduct of a prudent man that a verdict would be directed against him. But in the present case this question was rightfully left to the jury."

See, also, *Rademacher* v. *Railway Co.*, 158 Mich. 552 (123 N. W. 45); *Imus* v. *Railroad Co.*, 172 Mich. 292 (137 N. W. 682).

It is the well-recognized rule of law that the plaintiff could not rely entirely upon the stationary gates to insure her of a safe passage, but is required to make an independent observation before attempting to cross. This, when considering the evidence in the light most favorable to the plaintiff's case, it must be said that she did.

We are of the opinion that the decision in the *Sanford Case, supra,* is not necessarily controlling of the

situation presented by this record. There are many facts which distinguish it from the case at bar. The accident occurred in that case in the daytime, when the plaintiff had every opportunity to judge as to the distance of the train, the speed at which it was operated, his distance from the track, and his ability to stop his machine. It involved no application of the emergency rule, and it appears that the plaintiff there approached the track without seeing the train as soon as he should and at a rate of speed that he could not stop when he did. The record does disclose in the *Sanford Case* that there had been a watchman at the crossing, but it did not appear that Mr. Sanford placed any reliance on the absence of the flagman. He says he discovered that there was no flagman in the flagman's shanty, which was right in front of him, but he had no knowledge or opinion as to whether he ought to have been at the crossing at that time, never having passed over it before at that time of the day. There was nobody there to beckon him to come over the crossing. Mrs. Garland actually saw the open gates indicating a safe crossing, and it can be said, as was said in *Beach* v. *City of St. Joseph, supra:*

"It could be well contended that the gates, which the record discloses were easily seen, being open, was clearly an invitation to one approaching to cross, an assurance that the way was safe."

We are of the opinion that under all the circumstances of this case it should not be said as a matter of law that the plaintiff was guilty of contributory negligence, but that the court ruled properly in submitting that question, under proper instructions, to the jury.

Being of the opinion that the negligence of the defendant and the question of the contributory negligence of the plaintiff were submitted to the jury under

proper instructions of the court, we are constrained to hold that the judgment of the lower court should be, and is hereby, affirmed.

STONE, BIRD, and MOORE, JJ., concurred with KUHN, C. J.

STEERE, J. I think this is controlled by *Sanford* v. *Railway*, *supra*, and should be reversed.

OSTRANDER, BROOKE, and FELLOWS, JJ., concurred with STEERE, J.