LOUISVILLE & NASHVILLE RAILROAD COMPANY v. MRS. MAMIE FRAKES AND MRS. BETTIE PAYNE.

Middle Section. November 24, 1928.

Judgment affirmed by Supreme Court, May 24, 1930.

Keeble & Seay, A. W. Stockell and J. B. Keeble, Jr., of Nashville, for plaintiff in error.

Bass, Berry & Sims, of Nashville, for defendant in error.

FAW, P. J.   Two cases tried together by consent before a jury in the Second Circuit Court of Davidson county have been brought to this court in one transcript and docketed here under the above style.   A separate verdict was returned and a separate judgment rendered in each case, and from each of these judgments the Louisville & Nashville Railroad Company, defendant below, has appealed in error to this court.

About six o'clock in the evening of November 16, 1926, an automobile, in which Walter Frakes and Luther Payne were riding, was struck by a passenger train, known as the Pan-American, owned and operated by the Louisville & Nashville Railroad Company, on the crossing of the Shackle Island Road over the tracks of said railroad company, at the station of Hendersonville, in Sumner county, Tennessee, and, as a result of the collision, both Frakes and Payne were killed.

Mrs. Mamie Frakes, surviving widow of Walter Frakes, sued, for the benefit of herself and the three surviving minor children of her deceased husband, to recover damages (laid in the declaration at $50,000) for the alleged wrongful and negligent killing of said Walter Frakes.

Mrs. Bettie Payne, surviving widow of Luther Payne, sued to recover, for the benefit of herself and the five surviving minor children of her deceased husband, a like sum as damages for the alleged wrongful and negligent killing of Luther Payne.

There was a verdict for $15,000 in each case, and, after overruling a motion for a new trial on behalf of the railroad company, the court rendered judgment on the verdict in favor of the plaintiff and against the defendant in each case for $15,000 and costs. The railroad company perfected an appeal in the nature of a writ of error granted to it by the trial court and the case has been heard by this court on the record, with thirty-six assignments of error on behalf of the railroad company and excellent briefs and oral argument by able counsel for the parties, respectively.

For convenience of statement, we will refer to Mrs. Mamie Frakes and Mrs. Bettie Payne as plaintiffs, and to the Louisville & Nashville Railroad Company as defendant.

At the close of all the evidence on the trial below, the defendant moved the court to peremptorily instruct the jury to return a verdict for the defendant on the ground that there was no evidence to support a verdict in favor of the plaintiffs. This motion was overruled by the trial judge, and, through its first assignment of error, the defendant complains of this ruling.

One of the grounds of the defendant's motion for a new trial overruled by the trial court was, in substance, that there is no evidence to support the verdict of the jury in favor of the plaintiffs, and the defendant's second assignment of error is based on the action of the trial judge in overruling this ground of the defendant's motion for a new trial.

The first and second assignments of error above mentioned have made it necessary for us to carefully examine the pleadings and evidence in the record—the pleadings as well as the evidence—because the inquiry is not simply whether there was evidence introduced which would support an action on behalf of the plaintiff's respectively, and against the defendant, but whether there was evidence which would support the causes of action alleged in the declarations.

The first and second assignments of error may well be considered together, for, if there was evidence which required the submission of the case to the jury, over the defendant's motion for peremptory instructions, there was sufficient evidence to support verdicts for the plaintiffs.

With the exception of the necessary differences in names of the plaintiffs, the beneficiaries and the deceased, the material averments of the declarations in the two cases are the same in substance, and it will be understood that our statement of the contents of "the declaration" refers to both cases.

The declaration contains two counts. The first count is known in the record as the common-law count, and in this count it is alleged that defendant disregarded, and neglected to perform and discharge, certain specified duties which it owed to the deceased men under the common law. In the second count it is alleged that defendant failed to observe the requirements of the statute embodied in subsection 4 of section 1574 of Shannon's Code, which requires that "every railroad company shall keep the engineer, fireman, or some other person upon the locomotive, always upon the lookout ahead; and when any person, animal, or other obstruction appears upon the road, the alarm whistle shall be sounded, the brakes put down, and every possible means employed to stop the train and prevent an accident."

In each count it is averred that the death of plaintiff's deceased husband was a direct and proximate result of the negligent and wrongful conduct of the agents and servants of the defendant therein alleged. The defendant interposed a plea of not guilty to each declaration.

As a method of stating, in a concise manner, certain facts which appear from practically undisputed proof, we quote from the declaration as follows:

"On or about November 16, 1926, and for many years prior thereto, the defendant owned and maintained a system of railroads extending generally from Cincinnati in the State of Ohio, to New Orleans in the State of Louisiana, the lines of which system ran from the City of Cincinnati, Ohio, through Louisville, Kentucky, to Nashville, Tennessee, and Birmingham, Alabama, to New Orleans, Louisiana. Said defendant on or about the day aforesaid, and for a considerable time prior thereto, operated a direct train from Cincinnati, Ohio, to New Orleans, Louisiana, on a fixed schedule, which train was known and advertised as the Pan-American. Said train was elaborately equipped with a large number of steel cars and extra powerful engine, and was extensively advertised as a train deluxe, and was operated upon a schedule that required an extremely high rate of speed, so as to travel from one terminal to another in a minimum number of hours, all of which was a part of the generally advertised facts concerning the operation of said train.

"The said line of defendant railroad company between the cities of Louisville, Kentucky, and Nashville, Tennessee, passes through the town of Hendersonville, in Sumner county, Tennessee, there being a railroad station adjoining said railroad tracks near the point where

the public road extending from Shackle Island, Tennessee, to Hendersonville, crosses the right of way and tracks of defendant's said line. Said public highway is a well known and extensively traveled highway, and crosses the lines of the defendant railroad company in the village of Hendersonville, and runs almost at right angles with the rails of the defendant company's lines at said crossing.''

The remainder of the first count of the declaration includes some averments which, like those above quoted, were supported by undisputed testimony, and other averments which were admittedly the subject of sharp conflicts in the testimony of the witnesses, and still others, essential to a verdict for plaintiffs, concerning which counsel disagree as to whether there was or not a conflict of evidence—it being contended by defendant, through its counsel, that, with respect to the averments of facts essential to a recovery for plaintiffs, (1) there is no evidence showing any negligence on the part of the defendant, and (2) the uncontradicted evidence shows that the deceased men were guilty of negligence which directly and proximately caused or contributed to their death.

If the record sustains either of the defendant's contentions just stated, it follows, under well established rules, that the trial court erred in refusing to direct a verdict for defendant, notwithstanding numerous conflicts between witnesses with respect to facts which, although relevant, were not determinative of the controlling issues. Traction Company v. Brown, 115 Tenn., 323, 331, 89 S. W., 319.

We quote further from the common-law count of the declaration, as follows:

''Plaintiff alleges that the lines of defendant railroad company, a short distance north of said crossing, curve sharply to the west, and that said lines at the same place lie in and extend through a depression, or cut, approximately twelve to sixteen feet deep. There was located on the west side of said railroad lines, and between the south end of said cut and said crossing, a stock loading pen, a large stack of lumber, tool house and the railroad station or depot, which was a large, high, oblong building, and all of which were constructed and maintained by the defendant company. In addition to these permanent structures, on the day in question, to-wit: November 16, 1926, the defendant had placed and left four box cars on the side track on the west side of its main lines between said crossing and the south end of said cut, so that a person approaching said railroad crossing on said public highway, traveling from the west towards the town of Hendersonville, could not see a train approaching on said defendant's lines from the north, and going towards the south, until said person was practically on the west rail of said defendant's line and within striking distance of a train running thereon, his

view of such approaching train being entirely obscured by the obstructions aforesaid until arriving at such a point.

"The land to the west of the defendant's tracks at said public crossing, and for a great distance north of said crossing is high and hilly and covered with trees, whereas the land east of the defendant's lines at said crossing and north of said crossing was much lower, and as a result of this topography and said cut through said tracks, a person traveling on said highway west of said crossing could not hear the sound of an approaching train clearly, or as much so as on the east side, the noise of a train so approaching the crossing being deflected away from the west and towards the east side of said tracks.

"Because of the foregoing physical situation a person traveling on said highway west of said tracks could neither see nor hear a train approaching said crossing from the north, and the defendant railroad company had erected at said crossing what is known as a 'wigwag' alarm, consisting of an overhead signal with a red light, which signal was so constructed as to be put in motion by a train approaching said crossing from either the north or the south, and said approach also likewise causing an alarm bell attached to said mechanism to sound, which crossing signal was supposed to begin operating in sufficient time to warn a person traveling on said public road, so as to prevent him from going on said tracks when one of the defendant's trains was approaching said crossing.

"On or about November 16, 1926, plaintiff's husband, Luther Payne, while riding home from work, approached said crossing in company with Walter Frakes, in a Ford automobile, traveling east towards the town of Hendersonville, and while crossing said railroad tracks, exercising due care for their own safety, defendant's fast train known as the Pan-American, came out of said cut, wholly without warning of any character, and running at the highly reckless rate of speed of approximately seventy miles an hour, and crashed into the automobile in which plaintiff's husband was riding, totally demolishing said automobile and hurling the body of plaintiff's husband down an embankment forty or fifty feet from said crossing, and so bruising, mangling and mutilating his body that after intense physical and mental sufferings, he died before he could be removed and before medical service could be obtained for him.

"Plaintiff avers that said Pan-American train was more than an hour later than its regular schedule, and that at the time of the accident it was being operated by the defendant's agents and employees at a highly reckless and negligent rate of speed, to-wit: approximately seventy miles an hour, for the purpose of making up said lost time, and that said crossing signal or wigwag had been negligently and carelessly allowed by the defendant to become out of repair, so that it failed to operate and function upon the approach

of said train, and at the time plaintiff's deceased husband approached said crossing, said crossing signal or wigwag indicated to travelers on the highway that no train was at that time approaching.

"No warning or signal of any kind was given by any of the employees or operatives on the train of its approach to said crossing. Neither the whistle on the engine was blown nor the bell rung, as a warning to persons traveling on said highway, and said train did not appear around said curve and out of said cut until plaintiff's deceased husband was crossing said tracks and within striking distance of said train, and said train when it did appear, was going at such a high rate of speed that it was impossible for the automobile in which plaintiff's deceased husband was riding to proceed across said tracks and out of striking distance before said train crashed into said automobile.

"Plaintiff alleges that the death of her husband was a direct and proximate result of the reckless carelessness and negligence of the defendant railroad company, its agents and employees, in running and operating said train at such a highly reckless rate of speed, in total disregard of the lives and safety of persons traveling on said public highway, and in particular, over and across said public crossing where the view of a person on said highway was so obscured and hearing so obstructed by the physical surroundings above set out that it was impossible to see or hear said approaching train until within striking distance thereof, and then impossible to cross said tracks, without being struck by said approaching train; also in carelessly and negligently allowing or permitting said crossing signal or wigwag to become and remain out of proper repair so that said crossing signal instead of warning a person of the approach of a train, actively and affirmatively became a trap or deception to such person indicating that no such train was coming, and also carelessly, recklessly and negligently approaching said crossing under the circumstances hereinabove set out without sounding the whistle or ringing the bell to give warning of its approach. Plaintiff alleges that her deceased husband was at all times in the exercise of due care for his own safety."

The proof discloses certain facts not specifically alleged in the declarations which will conduce to a better understanding of the circumstances attending the collision, as follows:

The deceased men, Walter Frakes and Luther Payne, lived near the Gallatin pike, north of Hendersonville in Sumner county, and were employed as machinists at the "Powder Plant" in Davidson county. They had been thus employed at the Powder Plant for more than a year before the collision by which they lost their lives. At the time of the collision, and for four or five months prior thereto, the Gallatin pike south of Hendersonville, which was the usual and most

direct route to travel from the homes of Frakes and Payne to the Powder Plant, was undergoing reconstruction, and it was necessary for them to detour, which they did by leaving the Gallatin pike at Hendersonville and going by Shackle Island and Goodlettsville. By reason of the impassability of the Gallatin pike as above stated, the public travel over the Shackle Island road from Hendersonville was very heavy. The crossing of the Shackle Island road over the tracks of defendant at Hendersonville station, on which crossing the collision in question occurred, is about one-fourth of a mile west of the Gallatin pike. The deceased men were returning from their place of work to their homes in their accustomed manner at the time they met their death. They were necessarily familiar with the crossing and its surroundings, as they had been passing over it twice on each workday for four or five months. At the time of the collision they were riding in a Ford automobile with the curtains up. Frakes and Payne were the only occupants of the car at the time it was struck by the train. Payne owned the car but Frakes was driving it at that time.

There is much proof supporting the averments of the declaration with respect to the topography of the territory surrounding the crossing, the manner in which the railroad track approaches the crossing from the north, and the existence of obstructions to the view of travelers on the Shackle Island road approaching the crossing from the west; and the general description of the crossing and its surroundings and the approaches thereto contained in that part of the declaration which we have quoted may be adopted without repetition; but the extent to which the topography of the terrain and the obstructions alongside the railroad track prevented the deceased men from seeing the approaching train is a subject of controversy concerning which we shall presently speak more particularly.

The undisputed proof also shows that there was at the time of the collision (and had been for a considerable time theretofore) a "wigwag" signal and an alarm bell at the crossing, as alleged in the declaration, but there is a dispute as to whether these warning signals were operating at that time.

Additional facts disclosed by the proof with respect to the conditions at the crossing and the location of objects north of the crossing, are as follows:

There are two railroad tracks on the crossing and extending northward to a junction at an undisclosed point somewhere north of the several structures mentioned in the declaration. One of these tracks is known as the "main track" and the other is known as the "passing track," the latter track being west of the main track and adjacent to the station building and stock pens. The collision occurred on the main track. The distance between the center of the

main track and the center of the passing track is 12.9 feet, and the distance between the two nearest rails of the main track and the passing track is 8.2 feet. The width of each track, between rails, is 4.7 feet.

All of the permanent structures and the stack of lumber, mentioned in the declaration as obstructions to the view, were on the west side of the railroad tracks, except the tool house, which was on the east side of the main track and 236 feet north of the crossing. The fence around the stock pens was 5½ feet high, and the chutes for loading live stock out of the pens into cars on the passing track were 10½ feet in height. There were two semaphore signals north of the crossing—one 649 feet and the other 669 feet from the crossing. There was a "whistling post" (for crossing signals) 1422 feet north of the crossing. The wigwag signal and alarm bell before-mentioned were operated by means of an electric circuit which (if functioning normally) "cut in" and set the wigwag banner in motion and the alarm bell to ringing when a train approaching from the north reached a point 1947 feet from the crossing, and kept the banner in motion and the bell ringing until the rear of the train had passed over the crossing.

It is shown by the proof (as alleged in the declaration) that, a short distance north of the crossing, the defendant's track curves sharply to the west and enters, and extends through, a cut. It is also alleged that this cut is "approximately twelve to sixteen feet deep." It is shown, by proof of actual measurement, that the "highest point of the cut" (presumably meaning the wall of the cut) is 12.8 feet, and from that point it declines gradually, in either direction, for a distance of about 300 feet, where it reaches the grade level of the track.

Certain undisputed measurements of a locomotive, of the same type as that which collided with the Ford car in which Frakes and Payne were riding, were put in evidence, and from these it appears that from the top of the rail to the top of the smoke-stack is 15 feet, 1⅜ inches, and from the rail to the center of the headlight (which is "on the front end door of the locomotive in the center line of the boiler") is 9 feet, 9⅛ inches. The diameter of the headlight is not shown, except by inference from an estimate by a witness that the boiler is about 48 inches lower than the top of the smoke-stack, and the distance from the center of the headlight to the top of the boiler is about 2 or 2½ feet.

It appears that when the collision occurred there were three or four box cars, or stock cars, standing on the sidetrack (mentioned above as the "passing track") somewhere between the crossing and the stock pens, and there is substantial testimony to the effect that these cars, or at least two of them, were then standing alongside the

station building down to a point near the south end of the building and near the crossing.

The plaintiffs introduced witnesses familiar with the locus in quo, and whose characters for truth and veracity were not attacked, who testified, in substance and effect, that, by reason of the high ground and timber between the Shackle Island road and the railroad (west of the railroad and north of the Shackle Island road) and the obstructions to the view near the track (including the box cars or stock cars) which have been mentioned, it was practically impossible for one traveling in an automobile on the Shackle Island road eastward toward the railroad crossing at Hendersonville station, for a distance of about a half-mile from the crossing, to see a train coming from the north until the traveler reached a point between the tracks on the crossing where the front of his automobile was practically within striking distance of a train passing over the crossing on the main track.

There was also proof that the land east of the railroad track and north of the crossing was low (as compared with the elevation of the track and the land west of the track), and that trains approaching from the north could be seen much sooner and heard much more distinctly by persons on the east side of the track than on the west side.

A witness for plaintiffs (Gregory) testified that he watched the train in question from the time it emerged from the cut until the locomotive passed over the crossing, and that it was running at a speed of sixty or seventy miles an hour, and that he "never saw a train go any faster."

Plaintiff's witness T. J. Rutherford (who was, and had been for about twenty-three years, a rural mail carrier at Hendersonville, and who lived immediately southeast of the crossing) testified that he was in his yard near the crossing and heard the noise of the collision and looked around. His testimony as to the speed of the train was as follows:

"Q. Mr. Rutherford, when you looked around at that train, you say you heard that noise and looked around, was it going fast or slow? A. Going pretty fast, as fast as I ever saw one go.

"Q. What say? A. It was going about as fast as I ever saw a train go.

"Q. How fast would you say it was going, in your opinion? A. Something between sixty and seventy miles an hour."

The defendant's engineer and fireman on the locomotive drawing the Pan-American at the time of the collision testified that the train was running at a speed of about forty-five or fifty miles an hour as it approached the crossing.

It is shown that the locomotive struck the automobile with sufficient force to hurl it forty or fifty feet, and in its course it struck a switch stand a short distance south of the crossing and threw the switch, but the speed of the train was sufficient to carry the locomotive and one coach over the switch before it "opened." The remainder of the train, with the exception of the rear coach, went onto the sidetrack and was wrecked.

Was there any evidence before the jury reasonably tending to prove the alleged negligence of the defendant, as the proximate cause of the collision and the resulting death of Walter Frakes and Luther Payne? If there was, the trial court did not err in refusing to direct a verdict for the defendant, for "there can be no constitutional exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried, but the case must go to the jury." Hines v. Partridge, 144 Tenn., 219, 232, 231 S. W., 16. And "that view of the evidence which is most favorable to plaintiff's case must be taken by the court, and if there is any doubt as to the conclusion to be drawn from the whole evidence, the motion for peremptory instructions must be denied." Mayor, etc., v. Reese, 138 Tenn., 471, 479, 197 S. W., 492. Likewise, it is settled by decisions too numerous to need citation, that, on appeal in error from a judgment at law, based upon the verdict of a jury approved by the trial judge, the appellate court must accept the findings of the jury on the issues of fact, if there is any evidence to support that finding, and must take as true the strongest legitimate view of the evidence tending to support the verdict, and disregard all countervailing evidence.

Taking up first the common-law count of the declaration and the evidence as it relates to that count: We are of the opinion that actionable negligence cannot be predicated upon obstructions to the view alone, no matter by whom erected and maintained (2 Tenn. App. R., p. 392, and 5 Tenn. App. R., p. 99), nor merely upon the speed of the train apart from the surrounding conditions and attendant circumstances. "While no rate of speed is of itself negligence, it may be negligent to run a train at a high rate of speed through a populous community and over a much frequented crossing, or over a crossing where the view of the track is so obstructed as to render the approach dangerous. This is true although the crossing at which the accident occurs is in a country district, where the crossing is much used by the public." 22 R. C. L., p. 1013, sec. 244.

In the case of Railroad v. Milam, 9 Lea, 223, 226, after stating that, in several cases, it had been held that there was no law pre-

scribing the rate of speed at which trains should be run, the court said.:

"Nevertheless, it is evident there may be cases in which the speed taken in connection with the other circumstances existent at the time, may be an element of inquiry, on the question of negligence in the use of machinery of such tremendous power for mischief, by the parties having it under control. Independent of our statutory regulations, the principle applicable to this question is, that the company must so enjoy their own rights, as that the rights of others shall not be infracted, nor injury done to person or property, when this can be avoided by the exercise of the utmost prudence and care.

"Our statutory regulations but embody this principle, and it underlies them all. The principle applicable to this question is stated with reasonable accuracy by the Court of Appeals of New York, in the case of Massoth v. Delaware and Hudson Coal Company, 64 N. Y., 531, that 'where there is no statutory regulation fixing the rate of speed of trains, it is a question of fact, whether the rate of speed was excessive or dangerous in that locality, and if so found by the jury, and such excessive rate caused the injury, the road would be liable for the damages.' See also, Wilds v. H. R. R. R. Company, 29 N. Y."

The law as thus declared has been followed by our Supreme Court in other cases: Fitch v. Railroad, 3 Shan. Cas., 676, 678; E. T. & W. N. C. Railroad v. Winters, 85 Tenn., 240, 244, 1 S. W., 790; Chattanooga, etc., Co. v. Walton, 105 Tenn., 415, 427, 58 S. W., 736; Railroad v. Porter, 117 Tenn., 13, 20, 94 S. W., 666; C., N. O. & T. P. Railroad Co. v. Wright, 133 Tenn., 74, 81, 179 S. W., 641; Stem v. Interurban, 142 Tenn., 494, 507, 221 S. W., 192.

In the light of the proof in the case under review, it was for the jury to look to "all the circumstances, the situation of the parties, the topography of the premises, the obstructions near the track, and from all these and other circumstances determine" whether the defendant "exercised the proper care and caution in running the train at the time and the place of the accident." (105 Tenn., 428.)

The authorities touching the question of whether the failure of the wigwag signal to operate at the time of the accident would afford an independent cause of action to the plaintiffs are in conflict. Note, L. R. A., 1916D, p., 788. But that question may be pretermitted, for, as stated later, it is undisputed that defendant had no notice, or reasonable opportunity to know, that the wigwag and bell were out of order, and defendant was therefore not guilty of negligence in that respect. The law did not impose upon the defendant the duty of maintaining such automatic warning signals at the crossing, but the fact that these signals were not working as they had been maintained in operation by the defendant for a long period

of time immediately preceding the accident in question was a circumstance which the jury might properly take into consideration in determining whether due care was exercised by the deceased men. Railroad v. Gilbert, 131 Tenn., 201, 206, 174 S. W., 812; 22 R. C. L., p. 1041, sec. 274.

It should be stated in this connection that there is no evidence that the defendant had knowledge, or any information which would put it on notice, prior to the accident, that the automatic signals at the crossing were out of order; and it is shown by the undisputed testimony of Mr. Alexander, defendant's station agent at Hendersonville, that the wigwag and alarm bell were operating properly when the last train going south before the Pan-American passed Hendersonville less than an hour before the collision.

But there is evidence in the record upon which, when taken in connection with the evidence relating to the physical surroundings of the crossing, the extent of its use by the public, and the obstructions to sight and hearing, the jury could have found that defendant was guilty of actionable negligence which proximately caused the death of Frakes and Payne, in two particulars alleged in the declaration, viz: (1) in running the train at a high and dangerous rate of speed, and (2) in failing to give timely warning of the approach of the train to the crossing. See authorities cited, supra, as to speed of trains at "blind crossings," and also (as to duty to give notice of approach of train to public crossing), 22 R. C. L., pp. 952 and 997; Railroad v. Ross, 2 Tenn. App. R., 384, 393, and other authorities there cited.

We cannot agree to the contention of counsel for defendant that the testimony of plaintiff's witness Gregory, relating to the failure of the engineer to sound the whistle as the train approached the crossing, was negative testimony, and therefore should not be weighed against the positive testimony of the engineer, fireman and other witnesses for defendant who testified that the whistle was blown at or near the whistling post before mentioned.

Gregory testified, in substance, that, from his home on the east side of the railroad track and about two hundred yards north of the crossing (and at a place where he could ordinarily hear the whistle of trains coming from the north) he heard the "rumbling" of a train as it crossed a trestle over a half-mile north of the crossing, and (thinking that it was then later than the schedule time for the Pan-American) he listened for the whistle in order to ascertain whether it was a passenger train or a freight train, and that he heard no whistle, although he listened from the time the train crossed the aforementioned trestle, and watched the train from the time the locomotive emerged from the cut until it passed over the crossing. This was positive, not negative, testimony. Tennessee Central Rail-

way Co. v. Page, 153 Tenn., 84, 89, 282 S. W., 376; Butler v. Metropolitan Street Railway Co., 117 Mo. App., 354, 358, 93 S. W., 877.

In the case last cited, it is well said: "When a witness is in a situation and condition to hear a sound and, listening, hears none, his statement that he heard it not or that it was not made is as much the affirmation of the fact that there was no such sound as would be the assertion by another witness in like situation that the sound was made, an affirmation of that fact."

Such testimony raises an issue for the jury. Butler v. Metropolitan Street Railway Co., supra; Northern Pacific Railroad Co. v. Freeman, 174 U. S., 379, 43 L. Ed., 1014, 1015; Detroit Southern Railway Co. v. Lambert, 150 Fed. 555, 557.

It follows from the views above stated that the trial court did not err in declining to direct the jury to return a verdict for the defendant under the common-law count, unless there was undisputed evidence, susceptible of no other reasonable inference, that the deceased men were guilty of negligence which contributed, as a proximate cause, to bring about their own deaths.

There is no testimony in the record to the effect that the deceased men stopped their automobile, or that they looked or listened for a train, before going upon the track where they were struck by defendant's train. But, on this point, the plaintiffs rely (1) upon the presumption, arising out of the natural instinct of self-preservation, that Frakes and Payne exercised due care in the circumstances, and (2) that plaintiffs' proof did not disclose any contributory negligence on the part of Frakes and Payne, and, therefore, the burden was on the defendant to show such negligence, and this, plaintiffs insist, the defendant has not done.

For defendant it is insisted by counsel (1) that no such "presumption" as that above mentioned "obtained under the facts of this case," that is, they say, that in cases of collisions between travelers and railroad trains, on highway crossings over railroad tracks, the presumption, in the absence of evidence to the contrary, is that the traveler was guilty of negligence, and prima facie his fault was the proximate cause of the injury, and (2) that if such presumption arose in this case, it was rebutted, or caused to disappear, by evidence introduced on behalf of defendant showing proximate contributory negligence of the deceased men.

The "presumption of due care," concerning which there is much discussion in the briefs of counsel in this case, is defined in the second (1926) edition of Jones on Evidence (Vol. 1, sec. 257), as follows:

"Generally, in the absence of proof tending to show the contrary, where a person is killed by an accident to which there are

no eyewitnesses, the presumption of the law is that he was in the exercise of due care. Thus, it is presumed that a person stopped, looked and listened before crossing a railway track. The presumption is usually invoked only in such cases, and the true rule is that, in the absence of witnesses as to what deceased did or failed to do by way of precaution at and immediately before the time of injury, a presumption arises that, prompted by natural instinct, he exercised care for his own safety. This presumption is of fact, only, and is for the consideration of the jury; it rests upon the observed principle of conduct that men usually and ordinarily do exercise care for their own safety; and hence, if there is direct evidence as to how the deceased was conducting himself at the particular time and on the particular occasion, the presumption can have no weight and does not obtain. Clearly, the presumption cannot be indulged where the plaintiff's own evidence is such as to negative the truth thereof. It is also to be remembered in this connection, however, that carelessness is usually contributory negligence, and that it is for the defendant to allege, and the burden is upon him to prove, contributory negligence.''

We think the foregoing quotation, from Jones on Evidence contains a correct statement of law prevailing in Tennessee. Tennessee Central Railroad Co. v. Herb, 134 Tenn., 397, 401, 183 S. W., 1011; Tennessee Central Railway Co. v. Melvin, 5 Tenn. App. R., 85, 98. And that such presumption ordinarily obtains in personal injury cases, in the absence of evidence of the conduct of the injured person, is conceded by the learned counsel for defendant; but they insist that railroad crossing cases, such as that here under review, should constitute an exception to the rule, and, in the course of an extended argument in support of the contention thus made, they quote from Elliott on Railroads (3 Ed.), Vol. 3, sec. 1658, where the author says:

''The rule which seems to us to have the best foundation in principle, is, that in cases of collision between travelers and railroad trains the presumption, in the absence of anything to the contrary, is, that the traveler was guilty of negligence, and hence that, prima facie, his fault was a proximate cause of the injury, or at least that there is no presumption in his favor.

''It is established law that the track itself is a warning of danger, and it is a fact of which, because of its being a matter of general knowledge, courts take judicial notice, that multitudes of persons pass over railroad tracks in safety. It is also a matter of common knowledge, and therefore, a matter judicially known, that reasonable care on the part of the traveler will in all ordinary cases enable him to cross the track in safety.

These considerations require the conclusion, as we believe, that prima facie there was either a pure accident, or, if there was negligence, that the negligence of the plaintiff was nevertheless the proximate cause of the injury. It seems to us that evidence that a plaintiff received an injury at a railroad crossing of itself neither proves negligence on the part of the company nor the absence of contributory fault on the part of the injured person. But on this question there is conflict of authority, for many courts of high standing hold that the presumption is that there was no contributory negligence on the part of the plaintiff. The rule supported by the weight of authority is, as we have already said, that the burden of proving contributory negligence is on the defendant, but upon this question there is great conflict of authority. Granting, however, that the rule is that in cases other than actions to recover for injuries at crossings the burden is on the defendant, there seems, nevertheless, much reason for holding that it should not apply in crossing cases.''

But we cannot accept Judge Elliott's view as above stated, for the reason, if no other, that our Supreme Court ''has ranged itself with the large majority of the tribunals of this country in holding that, where a plaintiff's contributory negligence does not appear from the proof adduced by him, the burden to show its existence rests on the defendant,'' and has held that ''in jurisdictions such as ours in which the burden of proving contributory negligence is on the defendant, the further rule is that absence of negligence on the part of the person killed may be presumed from the natural instinct of self-preservation,'' and that ''the presumption based on such natural instinct may be employed in negligence cases where there are no eye-witnesses of, or direct testimony as to, the conduct of the person injured at the time of the accident which leads to his death.'' Tennessee Central Railroad Company v. Herb, supra.

However, as held by this court in Tennessee Central Railway Co. v. Melvin, 5 Tenn. App. R., 85, supra, ''the presumption arising from the natural instinct of self-preservation has application only in the absence of evidence, either direct or circumstantial, tending to show the circumstances surrounding the deceased at the time his injury was received or as to how the accident occurred, and disappears when such evidence is produced;'' and, in the instant case, defendant, through its counsel, insists that, if there was primarily a presumption that the deceased men exercised due care for their own safety as they approached the crossing, such presumption was rebutted, and caused to disappear, by evidence introduced on behalf of defendant at the trial below. The evidence on which defendant relies to support this contention is the testimony of the witness

George Coley who stated that he came out on the Shackle Island road at a point about seventy-five or one hundred yards east of the crossing and, looking toward the crossing, he saw an automobile coming toward the crossing from the west, and that he watched the automobile until it was within ten or fifteen feet of the crossing and that it did not stop. We quote Coley's testimony on this point, as follows:

"Q. Did you see anything up on the road on the other side of the track? A. Well, I seen a car coming on the other side.

"Q. Saw an automobile coming down on the other side? A. Yes, sir.

"Q. Did it have any lights on it, headlights? A. Yes, sir, it had lights on it.

"Q. Whereabouts was it when you saw it, could you tell exactly where it was up there? A. No, sir. It looked, seemed to be about ten, or fifteen feet of the track, when I was looking at it.

"Q. When you were looking at it? A. Yes.

"Q. Then what did you do? A. I turned and walked on, I thought it was going to stop.

"Q. Then what happened? A. Then I heard the crash of the motor.

"Q. How long, from the time you turned, until you heard the crash? A. I just turned and started to walk off, and made about a step, I reckon.

"Q. Then you heard the crash? A. Yes, sir.

"Q. Now, was this automobile still moving at the time you last saw it? A. Yes, sir."

On cross-examination, Coley testified further, on this subject:

"Q. And you saw the automobile coming? A. Yes, sir.

"Q. And you watched it, until it was in ten feet, was it in ten feet of the crossing, when you first saw it? A. I said, ten or fifteen feet, of the crossing.

"Q. It was in ten or fifteen feet of the crossing, when you first saw it? A. When I last saw it.

"Q. Where was it, when you first saw it? A. I don't know.

"Q. About how far? A. I have no idea.

"Q. How many minutes did you watch that automobile, coming down there? A. I didn't time myself.

"Q. About how long? A. When it came up, towards the crossing I thought it was going to stop, and I turned and walked off.

"Q. I didn't ask you that, I asked you about how long? A. I don't have no idea.

"Q. Would you say a minute? A. I don't have no idea.

"Q. No idea at all? A. No, sir.

"Q. Do you reckon it was a week? Huh? A. No, sir.

"Q. Well, was it a day? A. No, sir.

"Q. Now then, give us some sort of idea. A. I come out and seen it coming up to the crossing, and I was expecting it to stop, and I turned and walked on.

"Q. You walked, you saw it coming, out in the yard? A. I saw it when I come out on the road, I was looking, and seen the car come up the road.

"Q. Where were you, when you first saw the automobile? A. I came out of Mrs. Savely's, was standing in the road.

"Q. Had you come out of the gate, when you saw first the automobile, or just coming out? A. Just got out of the gate.

"Q. Then you walked up on the road? A. I was already in the road.

"Q. How long did you stand there; you said you stood there and saw it coming? A. Not over two or three minutes, I don't reckon.

"Q. Two or three minutes, and it came on down, the bell was ringing though, before you saw the car, wasn't it? A. Yes, sir.

"Q. Sir? A. No, sir, the bell was ringing, when the reflection of the car came up to the crossing.

"Q. What, I didn't understand that? A. I said the bell was ringing, as the reflection of the car was coming up to the crossing.

"Q. I say, the bell was ringing before you saw the automobile? A. Yes, sir.

"Q. Then you came out and stood there, and watched it, two or three minutes, you think? A. I reckon it was that long, before I left.

"Q. Sir? A. Yes, sir.

"Q. And you watched it for two or three minutes, until it came up, within ten feet of the track? A. Ten or fifteen feet.

"Q. Ten or fifteen feet of the track, and the bell was ringing, and the arm was waving, and the train was whistling? A. Yes, sir."

It is seen that the effect of Coley's testimony is that he was looking at the automobile while it was traveling an indefinite and unestimated distance in the direction of the crossing, and until it reached a point within ten or fifteen feet of the crossing, and that it did not stop while he was looking at it. But according to the testimony of three or four witnesses introduced by the plaintiffs in rebuttal, the witness Coley was in the business district of the village of Hendersonville on the Gallatin pike, about one-fourth of a mile from

the crossing, at the time the collision occurred. If these rebuttal witnesses told the truth, Coley did not see the Frakes and Payne automobile approach the crossing as he stated, and his testimony in that respect was untrue. Where the truth of the testimony of a witness is discredited in any of the modes recognized by law, the credibility of such witness is exclusively a matter for the determination of the jury. Frank v. Wright, 140 Tenn., 535, 542, 205 S. W., 434.

In Frank v. Wright, supra, the issue was, whether Mills, who was Frank's regularly employed chauffeur, was acting in the course of his employment as such chauffeur at the time Frank's automobile, driven by Mills, struck and fatally injured Wright's ·intestate. Frank testified that the car was in use at the time without his knowledge or authority, and that the chauffeur was on no mission for him; and Frank's counsel insisted, that, as Frank's testimony was unopposed by evidence to the contrary, the facts did not warrant the submission of the case to the jury. The Supreme Court held that, as the car ''was being used under conditions resembling those which normally attended its use in connection with its use in the Master's business,'' it would be presumed (in the absence of proof on the subject) that Mills, the chauffeur, was acting in the course of his employment at the time in question, and that, in view of the fact that the cross-examination of Frank tended to discredit his truthfulness as a witness, it was proper to submit the case to the jury. The court said: ''If the jury should thus discredit the testimony of Frank on the point the use the car was put to on the occasion in question, the prima facie case of his liability for the tortious act of his chauffeur would not be destroyed, as a matter of law, and therefore the direction of a verdict in Frank's favor was properly denied.''

We think the ruling, and the reasoning, of the court in the Frank case, supra, is directly applicable and controlling on the question now under consideration in the instant case, and that it was for the jury to say whether they would accept or reject the testimony of Coley. If the jury rejected Coley's testimony (and the verdict implies that they did), the presumption of due care on the part of the deceased men remained, unaffected, for the consideration of the jury.

As a necessary sequence of our views hereinbefore stated, we must assume, for the purposes of the appeal in these cases, that Frakes and Payne did everything necessary to the exercise of due care before going upon the railroad track where they were killed. The witness George Coley's testimony aside, there was no direct testimony that the deceased men did not stop, look and listen as best they could under the circumstances and conditions surrounding them as they approached the·crossing, and the plaintiffs were entitled before the jury to the presumption that Frakes and Payne did all or

any of these things which reasonable care demanded of them in the circumstances, and it was for the jury to say whether or not this presumption was overturned by the facts and circumstances in evidence or was consistent therewith. Memphis Street Railway Co. v. Carroll, 141 Tenn., 265, 267, 209 S. W., 640. The jury has found this issue in favor of the plaintiffs, and the jury's finding is binding on this court. Hines v. Partridge, supra, p. 233.

The defendant's motion for peremptory instructions was not only directed to the "whole case," but was also specifically directed to each count of the declaration in each of the two cases. It is therefore necessary, in disposing of the first and second assignments of error, to decide whether the trial court erred in refusing to peremptorily direct the jury to return a verdict for defendant upon the second, or statutory, count of the declaration.

As stated in a preceding part of this opinion, the negligence alleged in the second count of the declaration is confined to an averment that the defendant failed to observe the requirements of subsection 4 of section 1574, Shan. Code, which subsection has been hereinbefore quoted. It is an undisputed fact that the automobile in which Frakes and Payne were riding appeared as an obstruction on the railroad track in front of the locomotive, so that, the burden was on the defendant to prove that it had observed the precautions required by the statute in such circumstances, and if it successfully discharged this burden there could be no recovery under the second count of the declaration. Shan. Code, section 1576.

It is established by a long line of published opinions of our Supreme Court, many of which are cited in the briefs of counsel in this case, that (1) no duty rests upon the agents and servants of the railroad company to comply with the requirements of the statute (subsection 4) until an obstruction appears upon the track in front of the moving train, or so near to the track that it will be struck by the train; (2) the statute does not require impossibilities, and where an obstruction appears upon the track in front of the locomotive, or in striking distance thereof, so suddenly that a compliance with such precautions is impossible, no liability of the railroad company could be predicated on the failure to observe the prescribed precautions, and (3) where it becomes impossible, for want of time, to observe all the statutory precautions, or if some of the precautions are, under the circumstances of the given case, more effectual than others, then the railroad company must first observe those precautions which, from their nature, are best calculated and will be most effective to prevent the accident.

It is likewise held that the statute is "imperative and mandatory," and demands an absolute obedience to its provisions when possible, whether seemingly necessary or not, and that the impossibility to

stop the train before colliding with the obstruction does not excuse non-observance of the statutory precautions, so far as such observance is possible.

The engineer and fireman operating the locomotive involved in this case testified that they were on the lookout ahead at their proper stations in the cab of the engine—the engineer on the right or west side and the fireman on the left or east side. The fireman (Wilson), according to his own testimony, did not see the automobile before the collision, for the reason that the boiler in front of him obstructed his view of the crossing. The undisputed proof is that the brakes and other equipment of the train were ''in first class shape''—''not a flaw in it''—and the electric headlight was ''burning brightly'' (the collision having occurred after nightfall.)

The engineer (Bain) testified, in substance, that he saw the automobile as soon as his engine ''straightened out'' of the cut and the glare of the headlight fell on the crossing, and that the automobile was at that time on the main track at the crossing; that he attempted to apply the brakes, but before the brakes took effect the locomotive struck the automobile, and that he did not sound the alarm whistle (after he saw the automobile) or do anything to prevent the accident, except to attempt to apply the brakes as above stated. However, the engineer stated that he did everything that it was possible for him to do in the time at his command after he saw the automobile. We quote from the testimony of the engineer, as follows:

''Q. And when you got down, coming, after you came through the cut, you say, this automobile came out in front of your train? A. Yes, sir.

''Q. And you went after your brakes? A. Yes, sir.

''Q. But before you could get your brakes applied the collision occurred? A. I was that close on him, I didn't have over a second and a half, probably, to think and do everything, and it was all over.

''Q. I understood you to say—What speed did you say your train was running at that time? A. Well, as near as I can come to it, between forty-five and fifty miles an hour, probably fifty miles an hour, which would put me 72 feet every second. Now, you see what the space I had to think and get my brakes, and try to make a stop. Gentlemen, it was impossible.

''Q. Was it possible, after that automobile came into your view, for you to have stopped that train and prevented that accident? A. It was impossible.

''Q. Now, as you came, approaching Hendersonville, where were you sitting in your engine? A. Right on the seat, looking right straight ahead.

"Q. Where was your fireman? A. He was on the same, on the opposite side, sitting on the seat, too, looking right straight ahead. Of course, I don't suppose he could see it, because it came from my side, the fireman had no chance to see it.

"Q. How far would you say, Mr. Bain, that you were from the crossing, at the time the automobile came into your view, your vision? A. Well, as near as I can come to it, about 150 feet, not over 200 feet, anyhow. It is pretty hard for me to judge just exactly, but that is the best of my judgment.

"Q. Were you, which side of the engine were you sitting on? A. On the right side, the right-hand side.

"Q. You were sitting on the same side of the engine that the automobile approached? A. Yes, sir.

"Q. State if you can, how fast that automobile was running? A. Well, I couldn't say. It seemed like it was in full motion; it would be hard for me to say; maybe eight or ten or fifteen miles an hour, I couldn't say which. But, he was moving in full motion, it looked like to me, when I saw him.

"Q. You only got the vision in that time, that the train was running 150 feet, or about that, as you say? A. Yes, sir.

"Q. You say the automobile was then in full motion? A. Yes, sir, it looked to me, now, like it, as near as I can come to it. . . .

"Q. Your engine had straightened out there before you saw the automobile? A. Yes, sir, that is when I saw it, when I just straightened out and the headlight throwed the light right on the crossing, that is when I saw the auto. Now, gentlemen, how far that was, I couldn't tell you exactly, but, my judgment, the best that I know, that is about 150 feet, when I first saw the automobile."

On cross-examination, Mr. Bain, the engineer, testified further on the same subject, as follows:

"Q. Then, the next thing is, you came out of the cut, and you discovered this automobile on the track? A. Yes, sir.

"Q. It was on the track when you first saw it, and moving? A. Moving, yes, sir, moving.

"Q. Traveling, at what you would say was a normal rate of speed for an automobile. A. Yes, to the best of my opinion.

"Q. And from the time that automobile came into view, with it upon the track and traveling, you didn't have time to do anything else, I believe you said? A. Yes, sir.

"Q. That is right? A. Yes, sir.

"Q. So you didn't do anything else? A. Oh, yes, sir, I went after my brakes the minute I saw it.

"Q. I know, but you didn't put them on? A. But before I got to the brake and applied it, I done hit the car.

"Q. I understand that, I understood you, the reason you didn't do anything else, you say you didn't have time to do anything else? A. Well, what are you going to do in a second and a half?

"Q. I am not asking you that, I am asking you what you did, or didn't do, and the reason you didn't do anything else, was because you didn't have time? A. Yes, sir, I didn't have time."

Whether the engineer, in cases of this character, did all he could to prevent the accident is ordinarily a question for the determination of the jury in the light of all the evidence, although the engineer may express the opinion that he did all that was possible, in the time at his command, to accomplish that result. Fitch v. Railroad, 3 Shan. Cas., 676, 677.

In the instant case, as we have seen, the engineer testified that he saw the automobile when his engine passed the point of the curve north of the crossing, and he estimated his distance from the crossing at that time as 150 to 200 feet, and the speed of his train as 50 miles per hour. The witnesses varied in their estimates of the distance from the point of the curve at or near the south end of the cut to the crossing, but the defendant's witness J. C. James, a civil engineer, testified that, by an actual measurement made by him on the day he testified, this distance was 450 feet. As stated in the preceding part of this opinion, the rate of speed at which the train was moving was a matter of dispute.

A calculation shows that a train traveling 50 miles per hour moves at the rate of $73\frac{1}{3}$ feet per second; at 60 miles per hour it moves at the rate of 88 feet per second; at 65 miles per hour it moves at the rate of 95.3 feet per second, and at the rate of 70 miles per hour it moves at the rate of 102.6 feet per second.

The period of time available to the engineer within which to do the things prescribed by the statute for the prevention of accidents on railroads depended on the distance at which he saw, or by the exercise of due vigilance could have seen, the automobile on the track (or so near thereto as to be an obstruction to the train), and the rate of speed at which the train was moving. Was the engineer correct in his estimate of the distance as 150 to 200 feet, or was the witness James correct in his statement that it measured 450 feet, or was the witness Rutherford correct when he testified that it was about "six rails," or 198 feet? Again, were the engineer and fireman correct when they gave 50 miles an hour as their maximum estimate of the speed of the train, or were the plaintiffs' witnesses,

Gregory and Rutherford, correct when they estimated the speed of the train at 60 to 70 miles per hour?

These are questions of fact, and it was necessary that they be determined in order to ascertain whether the engineer saw the automobile on the track as soon as it could have been seen by the exercise of proper vigilance, and, if he did not fail of his duty in this respect, whether he could have done more than he did to prevent the accident, and further, whether the only thing which the engineer says he did, viz: attempt to apply the brakes, was, under the circumstances, the thing best calculated to prevent the collision.

It may also be observed that the defendant could not, through the negligent conduct of its engineer, deprive itself of the power to comply with the requirements of the statute, and then successfully rely upon the impossibility of observance of the statutory precautions. To be more specific: if the train approached a much-used public crossing (whereon the presence of persons and vehicles might reasonably be anticipated) at a rate of speed which the engineer knew would render it impossible to comply with the requirements of the statute if an obstruction appeared on the crossing, the non-observance of the statutory precautions would not be excused.

In Chattanooga Rapid Transit Co. v. Walton, 105 Tenn., 415, 421, 58 S. W., 737, the court said: "It is true that impossibilities are not required, and if all is done that should have been done, and the accident was unavoidable, the road will not be liable. . . . But when the impossibility and unavoidableness arise out of the default of the road, the road will still be liable;" citing, on the latter proposition, Nashville & Chattanooga Railway v. Anthony, 1 Lea, 516, and Railway v. Selcer, 7 Lea, 559. It is on this general principle that the liability of railroads under the statute is held absolute when persons are injured by backing trains (147 Tenn., 315, 319), and likewise, this is the underlying principle on which it is held that impossibility of compliance with the statutory requirements is not a defense when it results from defective brakes or other defective equipment of the train. (See Note 54 under sec. 1574, Shan. Code.) It was, therefore, for the jury, in the instant case, to determine whether the observance of the statutory precautions was rendered impossible (if found to have been impossible) by reason of negligence of the defendant. Fitch v. Railroad, supra, p. 679.

The record discloses still another reason for submitting these cases to the jury under the statutory count. It is obvious that, without the testimony of Bain, the engineer, the defendant could not, with any show of reason, claim that it had discharged the burden of showing that it had observed the statutory precautions. The plaintiffs introduced a witness whose testimony tended to discredit the truth of Bain's testimony with respect to the speed of the train. Bain, as before shown,

testified that the train was running about 45 or 50 miles an hour when it approached and passed over the crossing in question. On cross-examination he was asked if he had not stated to E. B. Hart (a passenger on the train), shortly after the wreck, that he (Bain) was running 60 or 65 miles an hour when the wreck occurred, and Bain denied that he made the statement. The plaintiffs introduced E. B. Hart as a witness in rebuttal, and Hart testified as follows:

"Q. I will ask you if shortly after the wreck, you heard the engineer make a statement as to the speed at which he was running? A. I did, yes, sir.

"Q. I will ask you whether or not you heard him say that he was running at 65 miles an hour and was trying to make up time? A. Yes, sir, he made that statement."

This constituted an attack upon the credibility of Bain by one of the much-used modes recognized by law, and the credit to which Bain was entitled as a witness was therefore a matter within the exclusive province of the jury to determine, under the ruling in Frank v. Wright, supra.

We are of the opinion that the court did not err in overruling defendant's motions for directed verdicts, and that there is evidence in the record upon which the jury could base verdicts in favor of plaintiffs. The provisions of the Act of 1917, Chapter 36, do not militate against the conclusion just stated. Hines v. Partridge, supra, p. 237; Tennessee Central Railway Co. v. Page, 153 Tenn., 84, 90, 282 S. W., 376; Crawford v. Railway, 153 Tenn., 642, 646, 284 S. W., 892; Tennessee Central Railway Co. v. Zearing, 2 Tenn. App. R., 451, 458. The defendant's first and second assignments of error are overruled.

It may be said, in passing, that much of the evidence introduced by defendant in support of its contention with respect to material issues has not been stated herein, for the reason that the sole inquiry under the first and second assignments of error is whether there was any material evidence reasonably tending to support the plaintiffs' cause of action as stated in the declaration. We have carefully examined the entire record, but it would merely extend this opinion to a much greater length, without serving any useful purpose, to state the evidence in detail.

In disposing of the remaining assignments of error we shall not follow the order in which they are assigned, but will deal with them in the order which to us seems most convenient.

The defendant's thirty-first assignment of error is as follows:

"The court erred in refusing the motion of defendant that the court direct the jury to return a special verdict in the cause, which motion was and is as follows:

" 'The defendant asks that the jury be directed to return a special verdict in these causes and that the court pronounce judgment thereon according to the law. The jury is asked to find on and answer the following questions:

" '1. At the time of the collision and before, as the train approached the crossing, was the engineer, fireman or some other person on the lookout ahead?

" 'Answer:

" '2. Did the automobile appear on the track or within striking distance of the train so suddenly that it was impossible for the engineer or other employe on the locomotive by using every possible means to stop the train and prevent the collision?

" 'Answer:

" '3. Was the wigwag signal at the crossing in good condition at the time the last train before the Pan American came from the north and passed Hendersonville station?

" 'Answer:

" '4. On approaching this crossing, was the whistle sounded or the bell on the engine rung at a point or points north of the crossing so as to reasonably warn travelers on the highway of the approach of the train at the speed at which the train was traveling?

" 'Answer:

" '5. Did the deceased, Walter Frakes and Luther Payne, stop, look or listen as they approached the crossing at a point or points where they could reasonably expect to see or hear a train that was approaching?

" 'Answer:

" '6. Did the deceased, Walter Frakes and Luther Payne stop within a distance of ten or fifty feet of the crossing before they undertook to pass over it?

" 'Answer:

" '7. At the time of the collision, was the wigwag signal operating properly, that is, was the bell ringing and the banner or wigwag working?

" 'Answer:

" '(Trans., pp. 644-5-6.) '

"The above motion was submitted to the court by the defendant after the court had overruled defendant's motion for peremptory instructions and before argument of the case before the jury. The court overruled the motion and declined to direct the jury to return a special verdict on the issues of fact submitted, as shown above, and in this action the court was in error.''

In the case of Life & Casualty Insurance Co. v. Robertson, 6 Tenn. App. R., 43, 53, the trial court, on the plaintiff's motion, had directed the jury to return a "special verdict," in the form of answers to questions (as sought in the instant case), and, on appeal in error from a judgment for plaintiff based on such special verdict, the defendant assigned the action of the trial court in this respect as error. This court held, upon a review of the authorities, that, in the absence of a statute applicable to the subject, it was within the power of the trial judge, in the exercise of a sound discretion, to direct the jury to return a special verdict, and a petition for certiorari to review this holding was denied by the Supreme Court.

The situation in the case now before us is the converse of that presented in the Robertson case, supra, in that, the trial judge declined to direct the jury to return a special verdict as requested by the defendant, and the defendant is now insisting that it was entitled, as a matter of right, to have the jury so directed, and (in the alternative) if it was a matter of discretion with the trial judge, that such discretion has been abused in this instance.

The Tennessee cases bearing on the subject of special verdicts, and also many other authorities, are cited in the opinion of this court in the Robertson case, supra, and we need not repeat here the citations and discussion in that opinion. The briefs in the present case contain some additional citations of authorities from other jurisdictions, and able discussions by counsel of the law with respect to special verdicts.

In Turney v. Railroad, 3 Hig., 628, 630, the Court of Civil Appeals, speaking through Judge Higgins, suggested the "advisability" of adopting the practice of requiring special verdicts, but, after stating some cogent reasons in support of the suggestion thus made, the court there said, "it must not be understood from the foregoing that the trial judges in Tennessee can in the present state of the law require without question jurors to return special findings such as we have indicated. It seems that the jurors must still be at liberty to return a broad, general verdict; that is, a finding generally for the plaintiff or for the defendant; and doubtless in cases where the trial judge requests the jury to return special findings he must inform them of their right to return this general verdict."

After a review of the authorities and an attentive consideration of the excellent briefs and argument of counsel, we are of the opinion that, in the absence of an enabling statute, the parties are not entitled, as a matter of right, to demand a special verdict.

But, however this may be, there was no error in the refusal of the trial court to direct the jury to return, as a special verdict, answers to the questions tendered by the defendant in this case, for the

reason that the questions thus tendered did not cover and include all of the material and controverted issues of fact in the case.

In a Note found in 24 L. R. A. (N. S.), on the subject of "what special verdict must contain," numerous adjudged cases are cited (on page 6) as supporting the statement of the Annotator that "the general, if not universal, rule is that it is essential to a special verdict that it contain all the ultimate facts upon which the law is to arise and the judgment of the court is to rest."

In Life & Casualty Insurance Co. v. Robertson, supra, this court said (at page 55) that, "a special verdict at law should, in order to support a judgment, pass upon every material issue of fact made by the pleadings;" citing 2 Elliott's General Practice, sec. 933; 25 Standard Ency. of Procedure, pp. 944 and 981; 22 Ency. of Pleading & Practice, pp. 981 and 984; 27 R. C. L., p. 875; Jones v. State, 2 Swan, 399, 403.

We think it obvious that answers to the questions which defendant asked to have submitted to the jury would not necessarily have embraced a finding upon all controverted material issues of fact necessary to support a judgment. The "ultimate" question of fact in the case was, what was the proximate cause of the collision which admittedly resulted in the death of Frakes and Payne? Was it negligence of the defendant in any of the particulars alleged in the declaration, or was it negligence of the deceased men, or was it concurring negligence of the defendant and the deceased men, or was the collision merely a fortuitous accident without fault on the part of the defendant or the deceased men?

A finding that the defendant's negligence was the proximate cause of the injury in an action for damages for alleged negligence is essential to the plaintiff's recovery; unless that fact appears by necessary inference from the facts found or from undisputed evidence. See Note in 24 L. R. A. (N. S.), pp. 21-24, and numerous cases there cited and digested. Moreover, answers to all of the questions tendered by defendant for submission to the jury would not have embraced a finding upon the issue to which the major part of the evidence for both sides of the controversy was directed, viz: the issue made upon that part of the declaration wherein each of the plaintiffs alleged that "the death of her husband was a direct and proximate result of the reckless carelessness and negligence of the defendant railroad company, its agents and employees in running and operating said train at such a highly reckless rate of speed, in total disregard of the lives and safety of persons traveling on said public highway, and in particular, over and across said public crossing where the view of a person on said highway was so obscured and hearing so obstructed by the physical surroundings above set out that it was impossible to see or hear said approaching train un-

til within striking distance thereof, and then impossible to cross said tracks, without being struck by said approaching train.''

We find no error in the action of the trial court in declining to direct the jury to return a special verdict as requested by defendant, and the defendant's 31st assignment of error is overruled.

At the conclusion of the main charge of the trial court to the jury, the defendant tendered to the court a number of special requests for instructions, four of which were given to the jury and the remainder were refused. The refusal of the court to give each of the requests thus declined is made the basis of a separate assignment of error by the defendant, which assignments will next be considered. However, it would extend this opinion (already too long) to an unwarranted length to copy herein all of these requests and also to copy portions of the main charge which, in some instances, we hold to be sufficient on the point covered by the requests, and we shall, for the most part, content ourselves with stating briefly the reasons for our rulings with respect to the refusal of the requests by the trial court, identifying each request by the number which it bears in the bill of exceptions and the number of the assignment of error relating to it.

Through its fifth assignment of error the defendant complains of the refusal of the trial judge to charge its Request No. 1, which reads as follows:

''I further charge you, gentlemen, that there is no evidence in this case upon which you could base a finding of negligence against the railroad company in the matter of the operation of the wig-wag signal which was located at this crossing, and I therefore, charge you not to consider any further this feature of the case.''

We have hereinbefore stated that we do not think the failure of the wigwag banner and the alarm bell at the crossing to operate at the time in question primarily afforded an independent cause of action to the plaintiffs, and the requested instruction above quoted conveys this thought, although it is not as carefully and accurately worded as it might have been. However, the trial judge gave to the jury two requested instructions which, in connection with the undisputed proof (to which we have heretofore referred) precluded ''a finding of negligence against the railroad company in the matter of the operation of the wigwag signal.'' The Requests thus charged were No. 9 and No. 22. Request No. 9 is as follows:

''I further charge you, gentlemen, that if you find from a preponderance of the evidence that the wig-wag signal was in proper working condition at the time of the passing of the last train south, prior to the Pan American train, which came in collision with the automobile, and that after this time, and

before the Pan American came to this crossing such wigwag signal became out of repair or in such condition as that it would not operate, and you further find that the time between these two trains was less than one hour, and you further find that the defendant railroad company nor any of its officers or agents had notice of the same, and, even if they did have notice, if they could not reasonably be expected to repair the signal within this time, then this would not constitute negligence upon the part of the defendant company in the maintenance of this wig-wag signal.''

Request No. 22 is in these words:

''I further charge you, gentlemen, that the agent, Ira Alexander, has testified in this case that shortly after the time he went off duty at five o'clock a train came south over this crossing and the wig-wag signal was operating and the bell thereon ringing, and, if you find that there is no evidence to the contrary, and this witness, having in no manner been impeached, then you must accept as true, the statement of such agent and regard this fact as established.''

The 5th assignment of error is overruled.

Through its Request No. 2 the defendant, in effect, asked the court to peremptorily instruct the jury to return a verdict for defendant under the second count of the declaration. This, we have already held, would have been error. The defendant complains of the refusal of this request through its 6th assignment of error, and this assignment is overruled.

Request No. 3 relates to the care required of the deceased men, in the event it should be found that the wigwag signal and alarm bell at the crossing were not operating at the time of the collision. This request, as far as it goes, states the law correctly, but this subject was fully covered by the charge given to the jury. The 7th assignment of error, which complains of the refusal of Request No. 3, is overruled.

The substance of Request No. 4 is that unusual and excessive speed of the train would not afford a basis for a recovery unless it was a proximate cause of the injuries to the deceased men. This was fully covered by the charge given. The 8th assignment of error, which complains of the refusal of this request, is overruled.

Request No. 5 states the provisions of subsection 4 of section 1574, Shan. Code, and states further that until an obstruction appears upon the track in front of the moving train, or in striking distance thereof, no duty rests upon the employees of the railroad company to comply with this statute; and also properly defines ''striking distance of the train.'' We think that, for all the purposes of this case, the jury was sufficiently instructed in the general charge and

in defendant's Request No. 12 (which was given to the jury) with respect to the matters contained in Request No. 5, and the 9th assignment of error, which complains of its refusal, is overruled.

Request No. 6 purports to define and compare positive and negative testimony, and to apply the definition and comparison thus given to the testimony of witnesses in this case. We have already, in this opinion, stated the distinction between positive and negative testimony, as pertinent to the facts of this case, and we do not think this requested instruction states that distinction correctly, and it was properly refused. The 10th assignment of error which is based upon the refusal of this request, is overruled.

Request No. 7 embodies the proposition that the failure on the part of the driver of an automobile to comply with the Act of 1917, Chapter 36, imposes on him the burden of showing by a preponderance of the evidence that he has taken the precautions required of him by law to avert a collision at such crossing before he can recover any damages or injuries resulting from a collision thereon. This is not in harmony with our view of the construction and effect of the Act of 1917, Chapter 36, as hereinbefore stated. The 11th assignment of error complains of the refusal of this request, and that assignment is overruled.

Request No. 8 is (barring a slight change in phraseology) an excerpt from the last paragraph of the opinion of the Supreme Court in the case of Stem v. Interurban Railway, 142 Tenn., 494, 221 S. W., 192, relating to the precautions which the law requires of travelers at railroad crossings, except that the opinion in the Stem case says that "to look and listen for cars at crossings is a positive, fixed duty, etc.," and the request says that "the duty to stop, look, or listen for trains at railroad crossings, is a positive, fixed duty, etc." The request was vitiated by the inclusion of the word "stop" as used therein. Under the holdings in this State, "the look and listen rule is the proper measure" of the duty of a traveler on a public road approaching a railroad crossing under ordinary circumstances. Hurt v. Railroad, 140 Tenn., 623, 641, 205 S. W., 437. Whether reasonable care, under the circumstances of a given case, would require that the traveler on the highway stop before going upon the crossing is a matter for the jury to determine, and not a positive, fixed duty under the law. The jury was correctly and sufficiently instructed on this subject. The 12th assignment of error, complaining of the refusal of this request, is overruled.

Request No. 9 was charged. Request No. 10 was properly refused. In stating the rule with respect to the burden of proof, the request does not discriminate between the common law action and the statutory action. The court does not err in refusing to give additional instructions upon the request of a party, where the instructions are

correct as to one count of the declaration but incorrect when applied to another count, and the request is general in terms. Railroad v. Acuff, 92 Tenn., 26, 33, 20 S. W., 348. Request No. 10 also makes non-liability of the defendant to depend entirely on the giving of timely warning signals of the approach of the train, without ref-erence to the question of liability for running the train at a high and excessive rate of speed over a dangerous crossing, etc. The 13th assignment of error complains of the refusal of this request, and that assignment is overruled.

Request No. 11 states the rule that "the performance of impos-sibilities in the observance of statutory precautions is not required, and where a person appears upon the track in front of an engine or in striking distance of a train so suddenly that a compliance with such precautions is impossible, no liability against the railroad com-pany can be predicated upon the failure to observe such precau-tions." We think the charge of the court given to the jury covered the subject of this request as fully as the facts of the case demanded, and the 14th assignment of error, based on the refusal of this re-quest, is overruled.

Request No. 12 was charged. Request No. 13 correctly states the general rule that it is the duty of the jury to reconcile the state-ments of witnesses which are seemingly in conflict if, under the facts and circumstances of the case, they can reasonably do so, and then the request undertakes to apply this rule specifically to the conflict between the witnesses as to the operation or non-operation of the automatic signals at the crossing, and also to the conflict between the testimony of George Coley and the testimony of the witnesses tending to show that Coley was not at a place where he could have seen the automobile approach the crossing, etc. For example, it is said in this request: "And, likewise, I charge you that if there is a seeming conflict between the testimony of the witness George Coley as to his movements just prior to the wreck and just subsequent there-to, and certain witnesses for the plaintiff who testified with reference to seeing him up at Saveley's store just a short while before the wreck talking to the section foreman, R. L. Stewart, you may de-termine whether such witnesses did not mistake some other man to whom Stewart was talking for Coley, and did not see Coley and Stewart talking together after Coley had been to the wreck and for the purpose of going to the village was to notify Stewart."

That part of Request No. 13 which we have just quoted was too argumentative. It would not have been proper for the court to thus single out the testimony of particular witnesses and suggest reasons for accepting the testimony of one witness rather than an-other. The 15th assignment of error, based on the refusal of Re-quest No. 13, is overruled.

Request No. 14 reads as follows:

"I further charge you, gentlemen, that there is no limit of speed prescribed by law for the operation of railroad trains in the State of Tennessee. The law allows and encourages railroad companies to furnish quick, prompt, and efficient service, and so long as they do not operate their trains in negligent disregard of the rights of others and especially of the rights of a person on the highway, the law does not concern itself with the rate of speed at which the railroad companies may operate their trains."

This request contains a correct statement of law, but we think it was sufficiently covered by the general charge wherein the court said:

"The law does not fix any speed limit for trains and hence mere speed at which a train is being operated does not alone constitute negligence. The defendant railroad company, had the right to make a certain schedule provided, in doing so, it operated its said train with reasonable care and prudence."

The 16th assignment of error, through which defendant complains of the refusal of this request, is overruled.

Request No. 15, with respect to the care which travelers on a railway are required to exercise when approaching a railroad crossing where there are obstructions to vision and hearing, was sufficiently covered by the main charge and defendant's Request No. 21 which was given to the jury; and the 17th assignment of error, based on the refusal of Request No. 15, is overruled.

Request No. 16 deals with the same subject as Request No. 15, supra, and was also sufficiently covered by the charge given. The 18th assignment of error, based on the refusal of Request No. 16, is overruled.

Request No. 16½ is, in substance, the same as Request No. 21, which latter request was given to the jury. The 22nd assignment of error, which complains of the refusal of Request No. 16½, is overruled.

Request No. 17 includes an instruction that "in cases of collision between travelers and railroad trains the presumption, in the absence of anything to the contrary, is that the traveler was guilty of negligence and hence prima facie his fault was the proximate cause of the injury." We have already held, in disposing of the 1st and 2nd assignments of error, that the doctrine thus stated is not the law in this State. The 19th assignment of error, complaining of the refusal of Request No. 17, is overruled.

Request No. 18 is in these words:

"I further charge you, gentlemen, that even though you should find that certain witnesses in this case have testified that a

train could not be seen or heard by a traveler approaching this railroad crossing at Hendersonville from the west, nevertheless if the plain physical facts in the case show beyond question that this is not true, then you cannot accept such testimony since testimony which contradicts physical facts and law cannot be accepted as evidence, and in determining this question you look to all the facts and circumstances including the pictures and photographs which have been taken and introduced in evidence before you to determine whether or not such testimony is contrary to the physical facts, conditions, and circumstances surrounding this case.''

The general rule of law which defendant was, by this request, seeking to have the court give in charge to the jury, is sound when applied to an appropriate state of facts, but, in our opinion, the facts of this case did not justify its application. In this case the controversy (to which this request was intended to apply) involved the existence of what the request terms ''the plain physical facts of the case,'' rather than a conflict between the testimony of witnesses on the one hand and admitted physical facts, or physical facts established by undisputed evidence, or facts of natural science and philosophy so authoritatively settled as to be matters of common and general knowledge, on the other hand. A photograph is not conclusive evidence of a ''physical fact.'' ''The weight to be given to a photograph as evidence depends, therefore, on a variety of circumstances. It does not conclusively establish the existence of the objects it represents. Its weight as a truthful and accurate representation is for the jury to determine by the same tests as those by which all other evidence is weighed.'' 3 Jones on Evidence (2 Ed. 1926), sec. 1419, p. 2580. The 20th assignment of error, through which defendant complains of the refusal of Request No. 18, is overruled.

Request No. 19 relates to the same subject as the Requests numbered 15 and 16, supra, and was properly refused for the reason that it was sufficiently covered by the main charge and defendant's Request No. 21 given to the jury. The 21st assignment of error, based on the refusal of Request No. 19, is overruled.

A literal duplicate of Request No. 19 appears in the bill of exceptions as Request No. 20, but, of course, no additional assignment of error is based thereon. Requests numbered 21 and 22 were charged.

Through its 23rd and 24th assignments of error the defendant asserts that the court erred in refusing to give in charge to the jury special Request No. 23 and special Request No. 24, respectively, submitted by the defendant, and two purported requests are copied into these assignments, respectively, but the record does not show any requests numbered 23 or 24, or that any requests such as those copied

into the 23rd and 24th assignments of error, were submitted to the trial court. They are not in the bill of exceptions, and appear nowhere in the record, except in the 32nd and 33rd grounds of the motion for a new trial below, which grounds of the motion for a new trial purported to be based on the refusal of the court to give such requests in charge to the jury. But a motion for a new trial is merely a pleading, and cannot be looked to as evidence of what occurred on the trial. Sherman v. State, 125 Tenn., 19, 49, 140 S. W., 209; Richmond, etc., Foundry v. Carter, 133 Tenn., 489, 493, 182 S. W., 240; T. C. R. Co. v. Vanhoy, 143 Tenn., 312, 324, 336 S. W., 225. Therefore, it not appearing that such requests as those set out in the 23rd and 24th assignments of error, respectively, were submitted to the trial court, these assignments are overruled.

Through its 25th, 26th, 27th, 28th and 29th assignments of error the defendant asserts that five excerpts from that part of the court's charge relating to the first, or common law, count of the declaration are erroneous. In order that the context may be seen, and the parts thus assigned as error may be better understood, we will copy that part of the charge in which the excerpts thus criticized appear, indicating the alleged erroneous instructions by italicizing, as follows:

"It was the duty of the deceased men, Luther Payne and Walter Frakes to exercise reasonable care and prudence for their own safety, as they approached and entered upon the right of way and tracks of the defendant, Louisville & Nashville Railroad Company, that is such care as ordinarily prudent persons would exercise under like circumstances and conditions as shown by the evidence in this case. Railroad tracks are a warning of danger and hence persons crossing or attempting to cross a railroad track must, while exercising ordinary care, bear in mind that trains may pass at any time. It was therefore the duty of the deceased men to look and listen for oncoming trains before crossing or attempting to cross the track of the defendant railroad. If there were obstructions between the deceased men and the approach of the train such as made it difficult to see an approaching train, and if for any reason it was difficult to hear an approaching train, this did not relieve them of the duty to exercise reasonable care and prudence to look and listen for the trains. *The mere fact that an accident occurred and they were killed does not raise any presumption that the deceased men failed to exercise that degree of care imposed by law. There is a presumption which the law indulges, that every man observes the law, that he exercises due care for the safety of himself.*

"This is not a conclusive presumption. The law presumes that the train men exercised reasonable care in operating defendant's train, the Pan-American, at the time of and before the accident, and likewise *the law presumes that the deceased men, Payne and Frakes, exercised reasonable care and prudence for their own safety, as they approached and entered upon the railroad tracks of the defendant. The statute provides that persons operating an automobile before crossing a railroad track, must bring it to a full stop, not less than ten nor more than fifty feet from the nearest rail. The statute further provides that a failure to do so will not defeat such persons' common-law right of action in case of an accident. It was, therefore the duty of the deceased men to observe this statute. If they failed to do so, for any reason it would not defeat plaintiffs' right of action as above stated.*

"As to the signal, placed by the defendant, at the crossing and called a 'wig-wag' signal, to warn travelers of the approach of trains, I charge you that the deceased men had the right to rely upon such signal to a certain extent. They were not, however, warranted in relying upon it altogether for the reasons that common experience teaches that no mechanical device is in perfect condition at all times. It was their duty, therefore, as they approached and entered upon the railroad track, to bear this in mind in exercising ordinary care for their own safety.

"*If you should find from a preponderance of all the evidence that the agents and servants of the defendant railroad company, knew, or by the exercise of ordinary care could have known that persons, while exercising ordinary care and traveling east towards Hendersonville, could not see or hear the approach of a train moving south toward the road crossing, because of certain obstructions, that said road was frequently traveled by automobiles and the public generally, anf if a preponderance of all the evidence shows that agents and servants of defendant, operating its passenger train, known as the Pan-American, failed to sound any alarm or give warning of the train's approach and such failure was the direct and proximate cause of the accident and consequent injury and death of Payne and Frakes, then the defendant would be liable in damages under the first count of the declaration,* and it would be your duty to so find, provided the deceased men were exercising reasonable care and prudence at the time they approached and entered upon the railroad track. If you should find from a preponderance of all the evidence that the defendant railroad had installed at said crossing a certain electric signal, called a wig-wag signal, to warn travelers of the approach of rail-

road trains, that at the time the deceased men, Payne and Frakes, approached the crossing and entered upon the track, the said electric signal was not in operation, and if a preponderance of all the evidence shows that the approach of the train was obscured from view by the depot, box cars, stock loading pen and other things, and, on account of these obstructions and the topography of the country, it was difficult to hear an approaching train, that the agents and servants knew or could have known that because of said obstructions a person could not see or hear an approaching train, or that seeing and hearing was difficult, that the said train, Pan-American, approached and passed said crossing at a fast and reckless rate of speed without giving reasonable and timely warning of the said train's approach, and as a direct and proximate result, the deceased Luther Payne and Walter Frakes were killed, then the defendant would be liable in damages under the first count of the declaration, provided you find that the deceased men exercised reasonable care and prudence in approaching and entering upon said crossing.

"On the contrary, if the proof shows that the approach of the train was not obscured from view of persons at and near the crossing, or while approaching it, that a person traveling along the road toward the crossing could by exercising ordinary care see at different points a train going south, and if the proof shows that deceased Payne and Frakes, while riding in an automobile as they approached the crossing, and exercising ordinary care, could see the approaching train and under such circumstances, they drove upon the railroad track and were killed, then there can be no recovery, and it would be your duty to find for the defendant under the first count of the declaration in each case.

"*I further charge you that if the train approached the crossing at a speed of sixty or seventy miles per hour and if the proof shows that said train sounded the whistle and gave timely warning, as it approached the crossing and if said train could have been seen by the deceased men while exercising ordinary care, and the glare of the headlight of the engine could have been seen by the exercise of due care, and you find from a preponderance of all the evidence that the deceased men failed to exercise reasonable care as they approached the crossing, then you must find for defendant under the first count of the declaration, and this should be your verdict even though the wigwag signal was not in operation.*

"I further charge you that if you find that the wig-wag signal was operating at the time deceased approached the crossing,

and if a preponderance of the evidence shows that they carelessly and negligently entered upon the crossing, and their said act, in any degree was the proximate cause of the accident, you should find for the defendant in each case under the first count of the declaration.

"If you should find from a preponderance of all the evidence that the agents and servants of defendant were guilty of negligence, or a failure to exercise ordinary care in operating a passenger train of defendant at the time of the accident, unless such negligence is shown by a preponderance of all the evidence to have proximately caused the accident, there can be no recovery, and if you should find that defendant's agents and servants were guilty of negligence and further find from a preponderance of all the evidence that the deceased men were guilty of negligence in failing to stop, look and listen for the approaching train, and their act in any degree contributed to the accident as the proximate cause, then you must find for the defendant in each case under the first count of the declaration.

"If you should find from the evidence that the deceased men were acquainted with the crossing, that they had passed over it daily for several months, and if they knew it was difficult to see and hear approaching trains, or that conditions were such that approaching trains could not be seen or heard while exercising ordinary care, then it was their duty to bear in mind the conditions at said crossing such as they knew to exist, and to exercise such care as a person of ordinary care would exercise who had knowledge of such conditions, and if they knew that a train could be seen at a certain point, approaching the crossing and could not be seen at other points, then it was their duty to use reasonable care to look at the point where it might be obscured, and a failure to do so would constitute negligence and would defeat a recovery under the first count, if it in any degree contributed to the accident, as the proximate cause."

It seems so obvious that the charge above quoted, including the instructions criticized by the 25th, 26th, 27th, 28th and 29th assignments, are in accord with our views of the law applicable to this case, as expressed in our discussion of the 1st and 2nd assignments of error, ante, that we deem it unnecessary to repeat what is there said. We find no error in the portions of the charge thus challenged, and these assignments are overruled.

Through its 30th assignment of error the defendant says that the court erred in charging the jury as follows:

"If you should find that the wig-wag signal was working as the deceased men entered upon the track and the preponderance of the evidence shows that the deceased men failed to stop, and

they carelessly and negligently went upon the track when the signal was working, the bell ringing and the light burning, then I charge you that such negligence should reduce the amount of the recovery to nominal damages.''

This instruction is the concluding paragraph of that part of the charge relating to the 2nd, or statutory count of the declaration. We think the learned trial judge erred in telling the jury (with respect to statutory negligence) that ''such negligence should reduce the amount of the recovery to nominal damages.'' In the case of T. C. R. R. Co. v. Binkley, 127 Tenn., 77, 153 S. W., 59, it was held that the trial court did not err in refusing a request to give a similar instruction to the jury. In that case the court (at page 86 of the opinion) said:

''By repeated published opinions of this court it is now well settled that in a case where the statutory precautions apply, founded on the failure to observe them, and in which they have not been observed, any contributory negligence of the injured party can only have the effect of mitigating the damages sustained. Railroad Co. v. Foster, 88 Tenn., 676, 13 S. W., 694, 14 S. W., 428; Patton v. Railroad Co., 89 Tenn., 378, 15 S. W., 919, 12 L. R. A., 184; Artenberry v. Railroad Co., 103 Tenn., 269, 52 S. W., 878; Chattanooga Rapid Transit Co. v. Walton, 105 Tenn., 419, 58 S. W., 737.

''And by the same cases and others it is also well settled that, however gross such contributory negligence in such case may be, it will not operate as a bar to the right of the injured party to recover some damages. Evidently, then, the measure of the recovery should, in such a case, be the amount of the damages sustained, so reduced or mitigated that the amount recovered will be a just demand, considering the degree or extent of the contributory negligence of the injured party. The determination of what sum should be recovered in such a case is a question of fact for the jury, and should be submitted to them under proper instructions upon the law applicable to the facts of such case.''

But, in the present case, this was error in favor of the defendant, and of which it, therefore, cannot complain. We find no other error in the instruction challenged by the 30th assignment of error, and that assignment is overruled.

The defendant's 32nd assignment of error is as follows:

''The court allowed W. A. Gregory, a witness for the plaintiff, to testify over the objection of defendant, as follows:

'' 'Q. I will ask you if, after the wreck, some time after the wreck, the railroad employes who had gathered there if you

saw anybody go down into that and open up that box where the battery is?

" 'MR. SEAY: I object to that as being subsequent to the accident.

" 'THE COURT: I will let him answer the question.

" 'Exception for defendant.' (Tr., p. 154.)

"The above action of the court is assigned as error."

It is seen that the assignment just quoted does not disclose any testimony of the witness Gregory. It shows a question asked the witness, an exception by defendant's counsel, a ruling by the court overruling the objection, and an exception by the defendant, and nothing more. The rules of this court (151 Tenn., p. 815) and the rules of the Supreme Court (126 Tenn., p. 722) governing assignments of error provide that "when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of the record where the evidence or ruling may be found." Manifestly the 32nd assignment not only fails to show "the full substance of the evidence," but fails to show any evidence, and that assignment is overruled.

The 33rd assignment is as follows:

"Assignment of Error No. XXXIII.

"The court permitted T. J. Rutherford, a witness for plaintiff, to testify over the objection of the defendant, as follows:

" 'Q. If you are traveling along here opposite the scales and depot along in this direction, coming towards the crossing in a car and the car running, can you see or hear a train as it comes from towards Gallatin? A. You can't see it and it is pretty hard to hear one.

" 'MR. SEAY: I want to object to that answer and the question. He can state the lay of the land, the physical conditions, and let the jury determine whether he can see or hear.

" 'THE COURT: I overrule the objection.

" 'Exception for defendant.' (Tr., p. 174.)

"The above action of the court is assigned as error."

The 35th assignment raises the same legal question as the 33rd. The 35th assignment is in these words:

"The court permitted B. L. Brooks, a witness for the plaintiff, to testify over the objection of defendant, as follows:

" 'Q. Mr. Brooks, suppose a man is coming from your house going to Hendersonville and approaching that crossing from your side, that is what the railroad calls the west side? A. Yes.

" 'Q. Riding in an automobile, or I will ask you if he can see a train that is coming from the north approaching the crossing? A. No, sir.

" 'BY MR. SEAY: Your Honor understands us as objecting to that question. We have heretofore objected to a similar question but we do not want to be understood as waiving our objection by not renewing it and I will not repeat it any further.

" 'BY THE COURT: Yes, sir; note your exception.' (Tr., p. 267.)

"The above action of the court is assigned as error."

Whether a train on a given section of track can be seen from a given point, or from any point on a given section of a highway, is a question of fact concerning which it is competent for witnesses familiar with the situation involved to testify. In many such cases it would be difficult to the point of impossibility for a witness of average intelligence and descriptive powers, no matter how thorough his knowledge of the situation, to describe conditions such as those about which Rutherford and Brooks were testifying (in their testimony quoted in these assignments) in such way that the jury could fully envision the situation and conditions sufficiently to reach an intelligent conclusion as to whether a train could be seen or heard, although the witness had definite and accurate knowledge on the subject, acquired from long-continued personal observation. To reject such testimony would often close a wide and important avenue to the truth of a case—the ascertainment of which is the pole star of the rules of evidence. No authorities are cited in support of the 33rd and 35th assignments of error. We think the testimony thereby challenged was properly admitted, and these assignments are overruled.

The 34th and 36th assignments of error will be considered together. The 34th assignment is as follows:

"The court permitted the witness R. L. Akens, over the objection of the defendant, to testify that after the wreck he saw an engine come in there with some carloads of steel rails—that it came down so as to cover the crossing; that this was some little bit after the wreck and that the signal bell did not ring when that engine came down there and did not ring while he stood there.

"The defendant made the following objection:

" 'BY MR. SEAY: We want to ask your Honor to exclude the testimony of this witness as to what transpired after the accident with reference to the wigwag there, on the ground it is subsequent to the accident, not material or competent.

" 'BY THE COURT: I think that might depend upon how long after the accident. Where was this Pan American when this train came down at the time you speak of not hearing this signal? A. Where was the wreck?

"'BY THE COURT: Where was the Pan American, the wrecked train? A. It was laying on the ground down there, the biggest portion of it.

"'BY THE COURT: I will let the testimony go in.

"'Exception for the defendant.' (Tr., pp. 214, 215.)

"The above action of the court is assigned as error."

And the 36th assignment is in these words:

"The court permitted B. L. Brooks, a witness for plaintiff, to testify over the objection of defendant, as follows:

"'Q. Did you see any train of any kind come down on that main track? A. Yes, sir.

"'Q. After the wreck? A. I did.

"'BY THE COURT: How long afterward? A. Judge, I just would not be positive in saying.

"'BY THE COURT: Approximately? A. Because we was all there you know and the time would fly I guess faster than on an occasion of anything of the kind, a wreck.

"'BY THE COURT: I know not exactly, but approximately how long it was? A. I would say anywheres from thirty minutes to an hour.

"'BY THE COURT: Go ahead.

"'BY MR. BASS: Q. What sort of train was it? A. Well, it was an engine—well, I think probably it was loaded, had some railings on it.

"'Q. Did it come down on the main track? A. Yes, sir.

"'Q. How close to the crossing did you see it come? A. It was right on the crossing.

"'Q. Came from the north? A. Yes, sir.

"'Q. Did that bell ring when that train came down there? A. It did not.

"'BY MR. SEAY. Your Honor understands we are objecting to that testimony as too far from the time of the accident.

"'BY THE COURT: Note your exception.' (Tr., pp. 270, 271, 272.)

"The above action of the court is assigned as error."

It is seen that the objection offered to the testimony copied into these assignments was that it was "subsequent to the accident" and "too far from the time of the accident."

Although the testimony is conflicting on the subject, there is evidence tending to show that nothing had occurred to change or alter the condition of the automatic signals at the crossing between the time of the accident and the time the train loaded with rails (as stated by Akens and Brooks) came down to the crossing. We are of the opinion that the testimony under consideration was admissible. "Evidence of conditions before or after the accident may be re-

ceived where it is also shown that the conditions testified to remain unchanged down to the occurrence of the injuries or to the time to which the evidence relates. So, evidence is admissible of conditions existing so short a time before or after the accident as, under the circumstances, to warrant an inference of fact that the same conditions existed when the injuries were received.'' Railroad Co. v. Lindamood, 109 Tenn., 407, 412, 74 S. W., 112. The 34th and 36th assignments are overruled.

This disposes of all the assignments of error except the 3rd and 4th assignments, through which defendant asserts that the verdict of the jury in each of the cases is excessive, and so excessive as to indicate passion, prejudice and caprice on the part of the jury.

Walter Frakes was thirty-five, and Luther Payne was forty-six, years of age. Both were machinists employed at the powder plant (where each was earning about thirty-five dollars per week) and were sober, industrious men of good habits and in good health. Walter Frakes left a widow (the plaintiff Mamie Frakes) and three minor children surviving, and Luther Payne left a widow (the plaintiff Bettie Payne) and five minor children surviving.

The sole reason offered in the brief in support of the 3rd and 4th assignments of error is the assertion that the deceased men were guilty of gross contributory negligence. The jury has decided this issue adversely to the defendant and, as stated in an earlier part of this opinion, we must assume, for the purposes of the appeal in these cases, that Frakes and Payne did everything necessary to the exercise of due care before going upon the railroad track where they were killed. This differentiates and distinguishes the instant case from the case of N., C. & St. L. Railway v. R. D. White, Admr., etc. et al., 158 Tenn., 407, 15 S. W. (2d), 1. The 3rd and 4th assignments are overruled.

It results that the judgments of the circuit court are affirmed, and judgment will accordingly be entered against the defendant railroad company in favor of plaintiff Mamie Frakes for $15,000, with interest thereon from the date of the judgment below, and costs, and likewise a judgment in favor of plaintiff Bettie Payne for $15,000, with interest thereon from the date of the judgment below, and for costs. The costs of the appeal will be adjudged against the defendant railroad company and the surety on its appeal bond.

Crownover and DeWitt, JJ., concur.

## ON PETITION FOR REHEARING.

### February 8, 1929.

On a former day of the present term an opinion was filed and a judgment entered affirming the judgment of the trial court in each of the two cases which had been tried together by consent in the Second Circuit Court of Davidson county and brought to this court in one transcript and docketed here under the above style.

The judgments thus affirmed were adverse to the Louisville & Nashville Railroad Company, the defendant below, and the railroad company has filed a petition for a rehearing upon the rulings of this court with respect to certain of the assignments of error specified in the petition.

■ The 23rd and 24th assignments of error purported to be based upon the action of the trial court in refusing to give in charge to the jury special request No. 23 and special request No. 24, respectively, submitted by the defendant below. These assignments were overruled, for the reason that the record did not show that any requests numbered 23 or 24, or that any requests such as those copied into the 23rd and 24th assignments of error were submitted to the trial court; that such requests appeared nowhere in the record except in the motion for a new trial, which was merely a pleading and could not be looked to as evidence of what occurred on the trial.

It now appears from the petition to rehear, supported by a certificate of the clerk of the trial court and an affidavit of counsel, that the aforesaid special requests of defendant, numbered 23 and 24, respectively, were included in the bill of exceptions in the circuit court, but were inadvertently omitted by the clerk of that court in making up the transcript of the record for this court; that this omission was discovered by counsel for petitioner before the hearing in this court and before the assignments of error were filed; that thereupon the attorneys for all the parties entered into a written agreement reciting, in a preamble thereto, the facts above stated, and stipulating as follows:

"NOW, THEREFORE, it is hereby stipulated and agreed that said special requests Nos. 23 and 24; having been erroneously omitted as aforesaid, but being correctly set out in defendant's motion for a new trial as appears in the transcript, Volume I, pages 48-49, that they are hereby incorporated by reference in the transcript of the record, and may be referred to as appearing at page 683 in Volume II of the record and this is to be taken and treated in the same way as if a diminution of the record had been suggested and duly certified by the Clerk of the Circuit Court of Davidson County."

It further appears, from the affidavit of the clerk of this court exhibited with the petition to rehear, that the aforesaid written stipulation of counsel was marked filed by the clerk as a part of the record in the cause and was placed with the transcript and sent to the court along with the balance of the record after the argument and hearing of the case.

A copy of the stipulation is set out in the petition to rehear, and in their reply to the petition the attorneys for defendants in error admit the facts above stated and offer no objection to the treatment of the record as if the aforesaid omitted requests had been supplied by a duly certified transcript thereof on suggestion of a diminution of the record.

The aforesaid written stipulation of counsel was not found, and its existence was unknown to the court when our former opinion was prepared and filed and judgment entered, although the whole record in the hands of the court was carefully examined. Presumably it was, by accident, mislaid and lost after it was placed with the transcript by the clerk.

The petition to rehear the case upon the questions raised by the assignments of error numbered 23 and 24 is granted—treating said special requests, numbered 23 and 24, as properly incorporated in the bill of exceptions and as having been seasonably tendered to and refused by the trial judge. Russell v. Russell, 3 Tenn. App. R., 232, 236.

(a) The 23rd assignment is that the court erred in refusing to give in charge to the jury special request No. 23 submitted by the defendant, which request was as follows:

"I further charge you, gentlemen, that the Act of 1917 of the General Assembly of Tennessee requires persons operating automobiles to come to a full stop before crossing railroad tracks at grade at a distance of not less than ten feet nor more than fifty feet from the nearest rail of such railroad track or tracks. I further charge you that it was the duty of the deceased husbands of the plaintiffs to comply with this law and if they failed so to do such failure constituted gross negligence.

"I charge you that if at any point or points within this distance of 10 or 50 feet the deceased men could, by stopping and looking, or listening have discovered the approach of the train in time to have prevented the collision, it was their duty to so do and if they failed so to do, this would constitute such negligence as to bar any recovery for any injuries they may have sustained, and if you find these to be the facts from a preponderance your verdict should be against the plaintiff and in favor of the defendant railroad company."

The instruction thus requested was, in substance and effect, that if the deceased men failed to comply with the requirements of the Act of 1917, chapter 36, the verdict of the jury should be against the plaintiffs and in favor of the defendant railroad company.

As applied to the common-law count of the declaration, such an instruction would have been directly contrary to the terms of section 3 of the Act, wherein it is provided, ''That none of the provisions of this Act shall be construed as abridging or in any way affecting the common-law right of recovery of litigants in damage suits that may be pending or hereafter brought against any railroad company, or other common carrier.''

In Crawford v. N., C. & St. L. Railway, 153 Tenn., 642, 646 (284 S. W., 892), it was held that the Legislature intended to confine the application of the Act (in common-law actions) ''to its penal force, excluding the inference of negligence per se.''

The requested instruction (No. 23) would likewise have been erroneous if applied to the statutory count of the declaration. In Tennessee Central Railway Co. v. Page, 153 Tenn., 84, 95 (282 S. W., 376), the court said:

> ''The violation of the Act of 1917 cannot be set up as altogether excusing the railroad of the imperative duty imposed upon it to observe statutes intended to protect life and property.''

The 23rd assignment of error is overruled.

(b) The 24th assignment is that the court erred in refusing to give in charge to the jury special request No. 24 submitted by the defendant, which request was as follows:

> ''I further charge you that if you find for the plaintiffs you should and must say whether you so find on both counts of the declaration, or if on only one count, which count. If you find for defendant on either or both counts you will so report in your verdict.''

Learned counsel for petitioner cite no authority supporting their contention that it would have been proper for the trial court to instruct the jury that, in their verdict, they must state their finding on each count of the declaration, in the manner set forth in special request No. 24, supra.

In 2 Thompson on Trials (2 Ed.), sec. 2137, it is said:

> ''In civil cases, unless restrained by statute, as in some States, where either party may require the jury to find special issues or answer special interrogatories, it is the privilege of the jury to decline finding any other than a general verdict.''

In the instant case, the trial judge charged the jury on this subject as follows:

"You must report a separate verdict in each case, and you may state under which count you find, or upon both counts, returning a general verdict."

The charge thus given to the jury is in accord with the rule stated in Thompson on Trials, as above quoted, and is in accord with the long-established and, so far as we know, uniform practice in this State.

In Tennessee, "the privilege of the jury to decline finding any other than a general verdict" is not "restrained by statute;" but, to the contrary, our statutes seem to impliedly recognize this privilege of the jury.

It is provided by sec. 2969 of the Code (Shannon 4694) that, "if any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts."

This statute was applied in the case of Tennessee Central Railway Co. v. Umenstetter, 155 Tenn., 935, 291 S. W., 452 (a railroad-crossing collision case where there was a common-law count and a statutory count), and a general verdict was sustained, although there was no proof to sustain the common-law count and the trial judge had submitted both counts to the jury upon a charge appropriate to the facts averred in each count.

We recognize the force of much that counsel for petitioner say in their petition and brief concerning the desirability of the practice for which they contend through their 24th assignment of error, but "the privilege of the jury to decline finding any other than a general verdict," in the situation here presented, is, in our opinion, too firmly imbedded in the practice in this State to be disregarded by the trial courts. Hence, the trial judge did not err in refusing defendant's special request No. 24, and the 24th assignment of error is overruled.

In this connection, it may be said that there would seem to be room for the contention that the defendant below waived its right to demand a finding of the jury on each count separately, by its failure to object to the form of the verdict after it was rendered by the jury and before judgment was entered. This suggestion is made in view of section 4593, Shan. Code, which provides that "any defect in entering a verdict where there are different issues, or the verdict is not responsive to the issues, shall be objected to before judgment is entered, or the objection will be considered as waived."

However, we do not rest our action with respect to the 24th assignment of error upon the Code section last quoted, but upon the grounds previously stated.

■ Petitioner also asks us to rehear, review and reverse our rulings upon the 5th, 21st and 32nd assignments of error, and on certain questions arising under the 1st and 2nd assignments of error.

642

We have attentively considered the reasons stated in the petition and brief for the insistence of counsel that our former opinion is erroneous in the respects indicated, but, after a re-examination of the questions involved, we are satisfied with our former conclusions and the reasons therefor stated in our opinion heretofore filed. A further discussion of these questions might possibly be an elaboration of the former statement of our views, but, in substance, merely a repetition, and therefore unnecessary.

■ It results that with respect to all except the 23rd and 24th assignments of error, the petition to rehear is denied and dismissed.

The 23rd and 24th assignments of error are overruled and the judgment of this court heretofore entered is reaffirmed.

Crownover and DeWitt, JJ., concur.